## AMERICAN–ARAB ANTI–DISCRIMINATION COMMITTEE, et. al, Petitioners,

v.

## John ASHCROFT, et. al, Respondents.

### No. 03–71639.

United States District Court,
E.D. Michigan,
Southern Division.

July 23, 2003.

---

3. Plaintiff's Counsel represented at the hearing that the amount would be $2,300.00.

Michael J. Connolly, Riley, Roumell, David K. Wenger, Detroit, MI, Nabih H. Ayad, Nabih H. Ayad Assoc., Dearborn, MI, Clifford J. Scharman, Riley, Roumell, Washington, DC, for plaintiffs.

L. Michael Wicks, United States Attorney's Office, Detroit, MI, for defendants.

MEMORANDUM AND ORDER DENYING RESPONDENTS' MOTION TO DISMISS AND GRANTING APPLICATION FOR A WRIT OF HABEAS CORPUS AND DENYING PETITIONERS' SUPPLEMENTAL EMERGENCY MOTION FOR WRIT OF HABEAS CORPUS AND FOR RELEASE FROM DETENTION, AND FOR AN ORDER THAT INTERIM DISTRICT DIRECTOR PHILIP WRONA BE HELD IN CONTEMPT

COHN, District Judge.

### I.   Introduction

This is a habeas case under 28 U.S.C. § 2241.  Petitioners are: [1][2]

Sami Kleit;

Malek Nasser;

Bilal Khanafer;

Kamel Khanafer;

Mohammad Khanafer;

Malek Shanine;

Essah Sobh;

Eid Sobh;

Nabila Jaber;

Ibrahim Naji;

Kassem Hachem;

Antonie Nasseredine;

Jawdat Nasseredine;

Tamer Mahmoud;

Malek Najer;

Mohammad Fares;

Moussa El Ammar;

Haithim Bazzi; and

Mohamad Hachem.

Respondents are:  John Ashcroft, Attorney General; Tom Ridge, Secretary, Department of Homeland Security;  Michael Garcia, Assistant Secretary of the Bureau of Immigration and Customs Enforcement; Phillip Wrona, Acting Interim District Director for the Detroit District of the Bureau of Immigration and Customs Enforcement (the Bureau); and Roy Bailey, Assistant District Director of the Bureau.

Petitioners are citizens of Lebanon who obtained fraudulent "advance parole" documents which allowed them to pass through into the United States at a port-of-entry.[3] All of the petitioners face removal.  Some of the petitioners have already been removed.  The documents were obtained as a result of a criminal conspiracy[4] which apparently resulted in some one hundred

---

**1.** The American Arab Anti–Discrimination Committee (AADC) is also named as a Petitioner.  The AADC purports to be suing on behalf of unnamed individuals allegedly in the same circumstances as the individually named petitioners.  However, as Respondent points out, the AADC lacks standing to sue on behalf of unnamed petitioners.  *See American Immigration Assoc. v. Reno,* 199 F.3d 1352, 1364 (D.C.Cir.2000) (holding that organizations seeking to vindicate the rights of unnamed aliens "do not have standing to raise claims, whether statutory or constitutional, on behalf of aliens subjected to IIRIRA's expedited removal system.").  Thus, the only petitioners in this case are the named petitioners listed *infra.*

**2.** As will be explained, not all of the listed petitioners have orders of expedited removal entered against them and it is only those petitioners against whom the expedited removal procedure has been invoked that are the subject of this decision.

**3.** There appears to be no dispute that the documents were fraudulently obtained in contrast to being counterfeited.  As the record stands, there is no evidence that the petitioners had anything to do with the issuance of the documents or knew the circumstances under which they were issued.

**4.** While the criminal conspiracy has yet to be proven by the government, it appears that there is no real dispute over the fact that money was paid to a Bureau agent to issue advance parole documents utilized by petitioners.

and thirty individuals coming into the United States without valid documentation.

Petitioners filed an application for a writ of habeas corpus challenging the Bureau's decision to commence expedited removal proceedings against them. As will be explained, expedited removal is a procedure by which certain aliens are deported based on the decision of an immigration officer without the opportunity for further review except under very limited circumstances. The conventional removal procedure, unlike expedited removal, allows an individual to challenge the removal before an immigration judge and to be represented by counsel, to appeal to the Board of Immigration Appeals, and to appeal to the appropriate federal circuit court. *See generally* 8 U.S.C. § 1229a, 8 U.S.C. § 1252(b)(2). Obviously, an individual who is removed under the conventional removal procedure is afforded more legal safeguards. This case deals with which removal procedure applies to petitioners.

Before the Court is respondents' motion to dismiss on the grounds that (1) the Court lacks jurisdiction to consider petitioners' claims, and (2) to the extent that the Court has jurisdiction, none of petitioners state a claim upon which relief may be granted.

For the reasons which follow, the Court finds that the Bureau's use of expedited removal proceedings in the unique circumstances of this case violates the petitioners' due process rights. Accordingly, petitioners' application for a writ of habeas corpus is GRANTED. The Bureau will be PERMANENTLY ENJOINED from using the expedited removal procedure against petitioners in order to effect their removal to Lebanon.

Also before the Court is "Petitioners' Supplemental Emergency Motion for Writ of Habeas Corpus and For Release From Detention, and for an Order that Interim District Director Philip Wrona be Held in Contempt." Because petitioners' release is initially a matter for the Bureau, this motion is DENIED. However, should the Bureau fail to initiate removal proceedings against petitioners under the conventional removal procedure within twenty days, including their eligibility for release under the conventional procedure, the Court will entertain any *individual* application for release.

## II. Background

### A. Procedural History

On April 28, 2003, petitioners filed an application for a writ of habeas corpus. An amended petition was filed on May 2, 2003 in which petitioners requested a preliminary injunction enjoining the Bureau from deporting any persons involved in the criminal conspiracy. Also on May 2, 2003, respondents filed a motion to dismiss. On May 2, 2003, the Court entered a temporary restraining order preventing the Bureau from removing any individuals involved in the criminal conspiracy.

On May 6, 2003, upon the Court's direction, respondents lodged with the Court a list of nineteen individuals who were being detained pending removal as a result of the criminal conspiracy.

At the May 9, 2003 hearing on petitioners' motion for a preliminary injunction, the parties, though counsel, expressed a desire to attempt to resolve their dispute in lieu of a hearing. The Court agreed and afforded the parties an opportunity to resolve the dispute. Unfortunately, the parties were unable to resolve their dispute.[5]

---

**5.** It appears an effort was made to find a way for petitioners to voluntarily return to Lebanon and then apply for admission to the United States without the five year bar on re-entry under Section 1182(a)(9)(A)(i).

On May 16, 2003, the Court held a hearing on respondents' motion to dismiss and took the matter under advisement. Petitioners moved for bond at the conclusion of the hearing. The Court denied the request but ordered the parties to appear for a bond hearing and stated that the Court would consider petitioners' bond requests on an individual basis.

The bond hearing was held on May 21, 2003. At that time, the Court indicated that it was not going to grant petitioners bond or order their release. However, the Court also stated that it would be issuing a preliminary injunction order barring the Bureau from using expedited removal proceedings against petitioners.

On May 22, 2003, the Court entered a preliminary injunction enjoining the Bureau from utilizing the expedited removal procedure against the named petitioners. The Court also stayed the request for bond for twenty days to give the Bureau an opportunity to institute removal proceedings under 8 U.S.C. § 1229a and/or file an appeal with the Court of Appeals for the Sixth Circuit. The Court further noted that respondents' motion to dismiss continued.

Respondents elected to file an appeal with the Sixth Circuit. The appeal, filed June 10, 2003, is still to be adjudicated.

On June 20, 2003, the Court advised the parties by letter that the case was in "a procedural morass" and stated its desire to resolve the merits of the case, i.e. whether the expedited removal procedure applies to petitioners. The Court also stated that it was satisfied with the papers and ready to proceed to a final decision. However, the Court afforded the parties an opportunity to supplement their papers within ten days. Respondent filed a supplemental paper.

## B. The Advance Parole Process and Immigration Procedures Generally

When an individual who has been legally admitted into the United States wants to change his or her immigration status, he or she must file an Application to Register Permanent Resident of Adjust Status (Form I–485). For instance, an individual in the United States on a student or travel visa who wants to change his or her status and become a lawful permanent resident, or "green card" holder, must file a Form I–485. An individual who has filed a Form I–485 may not leave and lawfully re-enter the United States while the application is pending without prior authorization from the INS. An individual may obtain permission to leave and legally re-enter the United States by filing an Application for Travel Document (Form I–131). Upon the approval of Form I–131, the Bureau may issue an Authorization for Parole of an Alien into the United States (advance parole document) (Form I–512). Form I–512 allows the individual to re-enter the United States without a visa. Thus, the individual applies for a Form I–512 by filling out a Form I–131. Significantly, an advance parole document is only issued where the alien is currently residing in the United States. An individual who presents Form I–512 to an immigration officer will be allowed to re-enter the United States. Advance parole is generally used when an individual has an application for adjustment of status pending at the time of their departure and wishes to continue the application process upon re-entry into the United States. In other words, advance parole is essentially advance permission to re-enter the United States; it is not given to those who have never been in the United States.

The statutory authority for advance parole is found at 8 U.S.C. § 1182(d)(5) which states:

(5)(A) The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

A 1998 Board of Immigration Appeals opinion provides the following useful description:

> "Advance parole" is a mechanism by which a district director can, as a humanitarian measure, advise an alien who is in this country, but who knows or fears that he will be inadmissible if he leaves and tries to return, that he can leave with assurance that he will be paroled back into the United States upon return, under prescribed conditions, if he cannot establish that he is admissible at that time [e.g., by presenting a valid immigration visa].

*In re G–A–C–*, 22 I. & N. Interim Dec. 3354, at 7, 1998 WL 394560 (BIA 1998) (en banc).

### C. The Criminal Conspiracy

At the time petitioners entered the United States, Bureau employees at the District Detroit Office of the INS were authorized to approve Form I–131 applications for issuance of advance parole documents.

According to an indictment filed in this district on April 9, 2003, in *United States v. Halstead*, 03–80364, Janice Halstead, an employee at the District Detroit Office of the Bureau conspired with Zoha Madarani for the purpose of bringing aliens into the United States who were residing outside of the United States and not otherwise eligible to legally enter the United States. Madarani would complete a Form I–131 for the alien which would be sent to Halstead. The application contained the individual's name and photograph. Also on the application was a Detroit area address for the individual. Halstead would approve the Form I–131 and sign a Form I–512 for the individual. The Form I–512 would be given to Madarani. Madarani, in turn, would give the Form I–512 to the aliens living outside the United States, in either Lebanon or Yemen. The individuals, or someone on his or her behalf, paid a fee for the Form I–512, ranging from $3,000.00 to $9,000.00. With the Form I–512, the individual was able to enter the United States.[6] This activity is said to have taken place from September 4, 1998 to September 14, 2000.[7] It is not clear the extent to which any of the individuals entering the United States with a Form I–

---

**6.** Halstead is also charged in a separate indictment in *United States v. Al–Solihi*, 03–80082, for engaging in a similar scheme with Salah Al–Solihi to bring aliens into the United States by issuing a temporary green card (Form I–551) to aliens which Al–Solihi would forward to the aliens living outside the United States, who paid a fee for the service. None of the petitioners are alleged to have entered the United States in this manner.

**7.** The Court takes judicial notice that Janice Halstead pled guilty on July 15, 2003 under a plea agreement. Specifically, Halstead plead guilty to count three of the indictment in case no. 03–80364 charging bribery, in violation of 18 U.S.C. § 201(c) and to count one of the indictment in case no. 03–80082 charging conspiracy to smuggle illegal aliens into the United States, in violation of 18 U.S.C. § 371.

512 were aware that they were doing so illegally.

### D. The Petitioners

Although all of the petitioners entered the United States with documents obtained as a result of the criminal conspiracy, their current circumstances differ. As discussed below,[8] at the time of entry, almost all of the petitioners had pending applications for a visa which had been filed on their behalf by a relative prior to entry into the United States.

#### 1. Sami Kleit

Sami Kleit entered the United States on February 6, 2000 with a fraudulently obtained Form I–512. The Form I–512 is dated January 18, 2000 and valid until January 18, 2001. On January 14, 2000, his mother, a lawful permanent resident, submitted a Form I–485 to obtain a visa on his behalf on which it is claimed that he entered the United States in 1998 through Texas. A visa is not yet available.[9] When the above criminal conspiracy was uncovered, Kleit was taken into custody and charged with removability under the expedited removal statute. However, an order of removal has not yet been entered because he expressed a desire for asylum. The Bureau is currently arranging a credible fear interview for him, a first step in obtaining asylum.

#### 2. Malek Nasser

Malek Nasser entered the United States on September 14, 2000 and again on July 4, 2000 with a fraudulently obtained Form I–512. The Form I–512 is dated July 9, 1999 and valid until July 4, 2000. On July 8, 1999, his mother, a lawful permanent resident, filed an Form I–485 to obtain a visa on his behalf. The Form I–485 states that Nasser entered the United States in July of 1997 from Detroit. The visa is not yet current. On April 23, 2003, Nasser was taken into custody and ordered removed based on an expedited order of removal.

#### 3. Bilal Khanafer

Bilal Khanafer first entered the United State on October 9, 2000 with a fraudulently obtained Form I–512. His Form I–512 is not in the record. On September 13, 2000, his mother, a lawful permanent resident, filed a Form I–485 to obtain a visa on his behalf. The Form I–485 states that Khanafer entered the United States in 1998 from California. The visa is not yet current. On April 22, 2003, he was taken into INS custody and ordered removed based on a expedited order of removal. On April 26, 2003, he was removed from the United States.

#### 4. Kamal Khanafer

Kamel Khanafer first entered the United States on July 6, 2001 with a fraudulently obtained Form I–512. The Form I–512 is dated May 11, 2000 and valid until May 11, 2001. On February 4, 2000, his mother, a lawful permanent resident, filed an Form I–485 to obtain a visa on his behalf. The Form I–485 states that Khanafer entered the United States in 1998 from California. The visa is not yet current. On April 22, 2003, he was taken into custody and ordered removed based on a expedited order of removal. On April 26, 2003, he was removed from the United States.

---

**8.** The following information is based on respondents' representations which have not been contradicted.

**9.** According to respondents' brief, a visa is the first step towards obtaining lawful permanent resident (green card) status. Petitioners in this case sought visas based on family relationships. Congress sets limits on how many visas may be issued each year for a particular country. Visas become "current" (or able to be used) based on a preference system, i.e. visas based on marriage are given priority over visas based on other family relationships.

### 5. Mohamad Khanafer

Mohamad Khanafer entered the United States on July 24, 2002 with a fraudulently obtained Form I–512. The Form I–512 in dated May 11, 2000 and valid until May 11, 2001. On February 11, 2000, his mother, a lawful permanent resident, filed a Form I–485 to obtain a visa his behalf. The Form I–485 states that Khanafer entered the United States in 1998 from California. The visa is not yet current. On April 22, 2003, he was taken into custody and ordered removed based on a expedited order of removal. On April 25, 2003, he was removed from the United States.

### 6. Malek Shanine

Malek Shanine entered the United States on November 6, 2000 with a fraudulently obtained Form I–512. On April 25, 2001, he filed a Form I–485 to obtain a visa based on a marriage to a United States citizen. The Form I–485 states he entered the United Stated in 1999 from California. He was taken into custody on April 28, 2003 and ordered removed based on an expedited order of removal. He has not yet been removed.

### 7. Essah Sobh

Essah Sobh entered the United States on May 22, 2000 with a fraudulently obtained Form I–512 which was valid until May 22, 2001. On August 7, 2001, the INS commenced removal proceedings against him based on the fact that he had remained in the United States longer than the Form I–512 permitted. Sobh failed to appear for a removal hearing. On May 22, 2002, an Immigration Judge entered an order of removal against him in absentia. Sobh later filed a motion to reopen, which was denied on July 8, 2002. An appeal is pending with the Board of Immigration Appeals. Sobh is *not* in expedited removal proceedings apparently because the Bureau initiated removal proceedings against him before learning that Sobh entered the United States as a result of the criminal conspiracy.

### 8. Eid Sobh

Eid Sobh entered the United States on April 4, 2000 with a fraudulently obtained Form I–512. The Form I–512 is dated March 3, 2000 and valid until May 3, 2001. On March 2, 2000, his mother, a lawful permanent resident, filed a Form I–485 to obtain a visa on his behalf. The Form I–485 states that Sobh entered the United States in 1999 from Detroit. His visa is not current. At this time, an order of expedited removal has not been entered against him.

### 9. Ibrahim Naji

Ibrahim Naji entered the United States on October 13, 2000 with a fraudulently obtained Form I–512. His form I–512 is not in the record. On September 23, 2000, his mother, a lawful permanent resident, filed a Form I–485 to obtain a visa on his behalf. The Form I–485 states that Naji entered the United States in 1998 from California. On April 21, 2003, he was taken into custody and an expedited order of removal was issued against him.

### 10. Nabila Said Jaber

Nabila Said Jaber first entered the United States on July 5, 2000 with a fraudulently obtained Form I–512. Her form I–512 is not in the record. On May 2, 2003, she was taken into custody and an expedited order of removal was issued against her.

### 11. Kassem Hachem

Kassem Hachem entered the United States on December 7, 2000 with a fraudulently obtained Form I–512. On September 13, 2000, his mother, a lawful permanent resident, filed a Form I–485 to obtain a visa on his behalf. The Form I–485 states that Hachem entered the United States in 1998 from California. On April 22, 2003, he was taken into custody and an expedit-

658

ed order of removal was issued against him.

### 12. Antonie Nasseredine

Antoine Nasseredine entered the United States on August 15, 1999 with a fraudulently obtained Form I–512. His form I–512 is not in the record. On July 22, 1999 a Form I–485 was filled out on his behalf, stating that he entered the United States in 1997. This application was deemed abandoned because he failed to appear for two scheduled interviews. He was taken into custody, but an expedited order of removal has not been entered against him because he claims a credible fear of persecution. The Bureau is evaluating his claim.

### 13. Jawdat Nasseredine

Jawdat Nasseredine entered the United States on August 15, 1999 with a fraudulently obtained Form I–512. His Form I–512 is not in the record. On July 22, 1999, his mother, a lawful permanent resident, filed an Form I–485 on his behalf. The visa is not yet current. On April 21, 2003 he was taken into custody and an order of expedited removal was entered against him.

### 14. Tamer Mahmoud

Tamer Mahmoud entered the United States on April 23, 2000 with a fraudulently obtained Form I–512. The Form I–512 is dated February 29, 2000 and valid until February 28, 2001. His mother, a lawful permanent resident, filed a Form I–485 on his behalf and his visa is current. However, his visa is subject to automatic revocation because he was married at the time of the filing of the Form I–485. An expedited order of removal has not yet been entered against him because he claims fear of persecution. The Bureau is evaluating his claim.

### 15. Mohammad Fares

Mohammad Fares entered the United States on December 30, 1999 with a fraudulently obtained Form I–512. The Form I–512 is dated November 16, 1999 and valid until November 16, 2000. His mother, a lawful permanent resident, filed a Form I–485 on his behalf. The visa was revoked on April 5, 2000. Mohammad Fares was taken into custody and an order of expedited removal was entered against him on April 24, 2003.

### 16. Moussa El Ammar

On June 9, 2003, Moussa El Ammar stipulated to an order of expedited removal. He was subsequently removed to Lebanon.

### 17. Haithim Bazzi

Haithim Bazzi is not currently in the Bureau's custody. According to Respondent, "while it appears that he came to the United States through a fraudulent advance parole document, he has not presented himself to [the Bureau] [and] . . . there is no expedited removal order against him."

### 18. Mohamad Hachem

Mohamad Hachem entered the United States on December 18, 2000 with a fraudulently obtained Form I–512. His Form I–512 is not in the record. On July 27, 2000, his mother, a lawful permanent resident, filed a Form I–485 on his behalf. The Form I–485 states that he entered the United States in 1998 from California. The visa is not current. He was taken into custody and an order of expedited removal was entered against him on April 29, 2003.

### 19. Malek Najer [10]

Respondents have not provided any detailed information about Malek Najer.

---

**10.** Respondents also detail the circumstances of Jalai El Hadi. He, however, is not a petitioner in this case although it appears that he

is also in the Bureau's custody and subject to an expedited order of removal.

### E. Expedited Removal Proceedings Generally

As part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) Congress enacted expedited removal provisions, which are found at 8 U.S.C. § 1225. 8 U.S.C. § 1225(b) provides in relevant part:

(b) Inspection of applicants for admission

(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled

(A) Screening

(i) In general

If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) [fraud] or 1182(a)(7) [no valid documentation] of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

### F. The Petition

On April 28, 2003, petitioners filed the instant application for a writ of habeas corpus challenging the efforts of the Bureau to remove them under the expedited removal procedure. They also challenged their detention pending removal. Petitioners (1) claim that their substantive and procedural due process rights are being violated, (2) seek injunctive relief in the form of an injunction barring their removal, (3) seek declaratory relief in the form of an order declaring that their removal is unconstitutional and contrary to statute, (4) claim that they are being denied equal protection, (5) claim that the Bureau has acted arbitrarily and capriciously in order-

ing expedited removal, and (6) claim that respondents should be estopped from removing them.

### III. Legal Standards

#### A. Motion to Dismiss

When analyzing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must take a plaintiff's well-pleaded allegations as true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 1, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). "[W]hen an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1039–40 (6th Cir.1991). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). "The complaint should not be dismissed unless it appears without doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Computer Leasco v. Volvo White Truck Corp.*, 820 F.Supp. 326, 332 (E.D.Mich.1993) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

#### B. Section 2241

A writ of habeas corpus may be issued when an individual is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). An individual in federal custody pending removal may challenge the constitutionality of his confinement pursuant to 28 U.S.C. § 2241. *See Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 312 n. 35, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

### IV. Analysis

#### A. Narrowing the Petitioners

For the sake of simplicity, the Court will first consider which petitioners are properly before the Court.

### 1. Bilal Khanafer, Kamel Khanafer, and Mohamad Khanafer

██ As noted above, Bilal Khanafer, Kamel Khanafer, and Mohamad Khanafer were removed to Lebanon prior to the filing of the instant petition. It is clear that for the purposes of the habeas statutes, a petitioner must be "in custody" at the time the petition was filed. *Rosales–Garcia v. Holland*, 322 F.3d 386, 395 n. 6 (citing *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998)). Because these petitioners were removed days prior to the filing of the petition, they were not in custody and the Court lacks jurisdiction to consider their claims. Accordingly, Bilal Khanafer, Kamel Khanafer, and Mohamad Khanafer are DISMISSED as petitioners in this case.

### 2. Essah Sobh

██ Essah Sobh is not in expedited removal proceedings. Rather, he was ordered removed under the conventional removal procedure on August 7, 2001. Accordingly, Sobh cannot make out a claim regarding the expedited removal procedure because he is not subject to it. His removal remains pending under the conventional removal procedure under 8 U.S.C. § 1229a. Accordingly, Essah Sobh is DISMISSED as a petitioner in this case.

### 3. Moussa El Ammar

Moussa El Ammar was removed to Lebanon. His claim is essentially moot. Accordingly, Moussa El Ammar is DISMISSED as a petitioner in this case.

### 4. Eid Sobh and Haithim Bazzi

██ Orders of expedited removal have not been entered against Eid Sobh or Haithim Bazzi apparently because they have not presented themselves to the Bureau. Thus, their claims are not ripe. Accordingly, Eid Sobh and Haithim Bazzi are DISMISSED as petitioners in this case.

### 5. The Remaining Petitioners

The remaining petitioners are those petitioners who have had orders of expedited removal entered against them. They are:

Malek Nasser;

Malek Shanine;

Ibrahim Naji;

Nabila Jaber;

Kassem Hachem;

Jawdat Nasseredine;

Malek Najer;

Mohammad Fares; and

Mohamad Hachem.

Also remaining are those petitioners against whom the expedited removal procedure has been invoked but who have not had an order of expedited removal entered against them because they have claimed a credible fear of persecution which the Bureau is still evaluating. They are:

Sami Kleit;

Antonie Nasseredine; and

Tamer Mahmoud.

### B. Subject Matter Jurisdiction

#### 1.

██ Respondents argue that the Court lacks subject matter jurisdiction to consider petitioners' claims. Respondent says that 8 U.S.C. § 1252(e)(2) permits only limited habeas review of an order of expedited removal. This section provides in relevant part:

(2) Habeas corpus proceedings

Judicial review of any determination made under section 1225(b)(1) [expedited removal] of this title is available in habeas corpus proceedings, but shall be limited to determinations of—

(A) whether the petitioner is an alien,

(B) whether the petitioner was ordered removed under such section, and

(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

8 U.S.C. § 1252(e)(5) further explains the court's limited ability to review an order of expedited removal under section 1225(b)(1), providing:

In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to petitioner. There shall be no review of whether the alien in actually inadmissible or entitled to any relief from removal.

8 U.S.C. § 1252(a)(2) also emphasizes the court's limited role in reviewing orders of expedited removal, stating:

(2) Matters not subject to judicial review

(A) Review relating to section 1225(b)(1) [expedited removal]

Notwithstanding any other provision of law, no court shall have jurisdiction to review—

(i) except as provided in subsection (e) of this section, any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,

(ii) except as provided in subsection (e) of this section, a decision by the Attorney General to invoke the provisions of such section,

(iii) the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or

(iv) except as provided in subsection (e) of this section, procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

In addition to the above statutory sections, respondents cite *Brumme v. INS*, 275 F.3d 443 (5th Cir.2001), where the Court of Appeals for the Fifth Circuit agreed with the government's argument that habeas review of an expedited order of removal is limited to the grounds set forth under 8 U.S.C. § 1252(e)(2). The petitioner in *Brumme*, a German native and citizen, was stopped by an INS Immigration Inspector at the Dallas Fort Worth Airport. The inspector determined that Brumme did not have a valid unexpired visa and ordered her removed under the expedited removal statute and apparently scheduled her removal to Germany for the next day. The next day, a Saturday, before Brumme was to depart on a flight to Germany, she filed an application for a writ of habeas corpus and a temporary restraining order against her removal. The district court entered an order to show cause why she was not entitled to a hearing before an immigration judge prior to removal and to present Brumme for a hearing on Monday. Brumme, however, was removed to Germany on a flight later that day (Saturday). She then moved to hold the INS in contempt. The district court later dismissed the petition for lack of jurisdiction, relying on 8 U.S.C. § 1252(e)(2) and (e)(5). The district court determined that Brumme was really asking the court to review whether she was "admissible" or "entitled to relief from re-

moval" which are explicitly not subject to review.

The Court of Appeals for the Fifth Circuit affirmed, explaining:

The IIRIRA recognizes limited judicial review, in the United States District Court for the District of Columbia, of certain challenges to the expedited removal "system". 8 U.S.C. § 1252(e)(3). The system has been challenged in that court on various grounds, including the contention—akin to Brumme's—that expedited removal should not apply when an alien's travel documentation is facially valid. *See American Immigration Lawyers Ass'n v. Reno,* 18 F.Supp.2d 38 (D.D.C.1998), aff'd, 199 F.3d 1352 (D.C.Cir.2000). The district court held that plain language "refutes [the] argument that inspecting immigration officers are restricted [to making] determinations of the 'facial' validity of documents". *Id.* at 56.

The nub of Brumme's contention is that the plain language of 8 U.S.C. § 1252(e)(2)—permitting habeas review of, inter alia, "whether the petitioner was ordered removed under [§ 1225(b)(1)]"—"permits the court to review whether [§ 1225(b)(1)] was applicable in the first place." She makes this contention, despite Congress' admonishment that, as quoted earlier, in determining whether a habeas petitioner was ordered removed under § 1225(b)(1), "the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner." 8 U.S.C. § 1252(e)(5) (emphasis added). Brumme attempts an end run around this language; but the language is clear, and the matter ends there. *See Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) ("The controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written.").

. . . .

The Ninth Circuit agrees. Post–St. Cyr, and in response to a similarly-situated habeas petitioner's assertion that the district court had jurisdiction to consider whether § 1225(b)(1)(A)(i) applied (the same assertion Brumme makes), the Ninth Circuit held: "With respect to expedited removal orders, . . . the statute could not be much clearer in its intent to restrict habeas review". *Li,* 259 F.3d at 1134–35 (emphasis added).

275 F.3d 443 at 446–48.

In *Li v. Eddy,* 259 F.3d 1132 (9th Cir. 2001), *later vacated as moot,* 324 F.3d 1109 (9th Cir.2003), referenced in *Brumme,* the Court of Appeals for the Ninth Circuit rejected a petitioner's claim for review of an order of expedited removal. Li was also stopped by an immigration officer at an airport in Anchorage, on route from China to New York. The immigration officer determined that her documents were not valid and therefore ordered her removed under the expedited removal statute because she had attempted to enter the United States fraudulently. Six days later, Li filed an application for a writ of habeas corpus contending that her visa was valid. The district court dismissed the petition for lack of jurisdiction. The Court of Appeals for the Ninth Circuit affirmed because Li was essentially asking the courts to determine whether her visa was valid and that under 8 U.S.C. § 1252(e)(5), there is no review of whether an alien is admissible, i.e. entered lawfully.

2.

The Court agrees partially with the Fifth Circuit's reasoning in *Brumme* and the Ninth Circuit's reasoning in *Li.* Under 8 U.S.C. § 1252(e)(2), judicial review of any determination made under the expedited removal statute is available in habeas

corpus proceedings, but limited to determinations of—

1.  whether the petitioner is an alien,
2.  whether the petitioner was ordered removed under the expedited removal statute, and
3.  whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee ... or has been granted asylum
    ....

In determining "whether an alien has been ordered removed under the expedited removal statute," the Court decides (1) "whether such an order in fact was issued and (2) *whether it relates to the petitioner* and [t]here shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal." 8 U.S.C. § 1252(e)(5) (emphasis added).

The answers to most of these determinations are not disputed. Petitioners are aliens, they have been, or expect to be, ordered removed under the expedited removal statute, and they have not argued that they are lawful permanent residents, refugees, or been granted asylum. There is also no question that orders of expedited removal have been entered against them.

Unlike the courts in *Brumme* and *Li*, however, the Court does not read the statutory language restricting the court's jurisdiction so narrowly. In determining whether "the petitioner was ordered removed under the expedited removal statute," the Court finds that under the circumstances here, it has jurisdiction on habeas review to determine whether the expedited removal statute was *lawfully applied* to petitioners in the first place. The review for whether the statute has been lawfully applied is a review of the question of whether an order of expedited removal has been entered against them and whether the order "relates" to the individual. Importantly, the Court is not reviewing whether petitioners should be removed or whether they are admissible or whether they are entitled to relief from removal. Rather, the Court is determining whether the expedited removal procedure "relates to" petitioners in the sense that it lawfully applies to them. If the statute has not been lawfully applied, the question then becomes whether the unlawful application has violated petitioners' constitutional rights.

Accepting the argument that the expedited removal statute does not provide the Court with jurisdiction on habeas review to consider the propriety of the application of the expedited removal statute to petitioners would effectively mean that the Bureau would be allowed to judge the bounds of its own statutory authority. This calls to mind Justice Jackson's statement regarding infallibility and finality. The Bureau's authority "[would not be] final because [it is] infallible, but [would be] infallible only because [it is] final." *Brown v. Allen,* 344 U.S. 443, 540, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (Jackson, J., concurring in result).

### C. Petitioners' Remaining Claims

Respondents also argue that even if the Court has habeas jurisdiction over petitioner's claims, their claims still fail.

#### 1. The Statute

##### a.

Respondents argue that petitioners are subject to expedited removal based on the plain language of the expedited removal statute. The expedited removal statute was enacted as part of the IIRIRA. The expedited removal provisions are found at 8 U.S.C. § 1225. 8 U.S.C. § 1225(b) provides in relevant part:

(b) Inspection of applicants for admission

(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled

(A) Screening

(i) In general

**If an immigration officer determines** *that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States* [11] or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) [fraud] or 1182(a)(7) [no valid documentation] of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

(Emphasis added).

As explained in INS Order No. 2243–02: [E]xpedited removal proceedings may be applied to two categories of aliens. **First, section 235(b)(1)(A)(i) of the Act, 8 U.S.C. § 1225(b)(1)(A)(i), permits expedited removal proceedings for aliens who are "arriving in the United States,"** except Cuban citizens who arrive in the United States ports-of-entry by aircraft .... **Federal regulations define an "arriving alien." 8 C.F.R. 1.1(q).**[12]

(Emphasis added).

An "arriving alien" is defined in the regulations, 8 C.F.R. 1.1(q), as follows:

The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. **An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act,** except that an alien who was paroled before April 1, 1997, or an alien who was granted advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, shall not be considered an arriving alien for purposes of section 235(b)(1)(A)(i) of the Act.

b.

■ Respondents say that petitioners are "arriving aliens" within the meaning of the expedited removal statute. Respondents point to the language in the regulation defining an arriving alien—that an alien remains an arriving alien "even if paroled"—to argue that because petitioners were paroled into the United States with fraudulently obtained advance parole

---

**11.** Subparagraph (F) states that expedited removal proceedings "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." 8 U.S.C. § 1225(b)(1)(F).

**12.** The second category of aliens subject to expedited removal is:

any or all aliens who have not been admitted or paroled into the United States and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2–year period immediately prior to the date of the determination of inadmissibility by an immigration officer.

8 U.S.C. § 1225(b)(1)(iii)(II). Respondents do not now argue that petitioners fit under this category of aliens. Indeed, petitioners were paroled into the United States via advance parole and have, for the most part, lived in the United States for more than two years.

documents, they fall within the definition of "arriving alien."

Respondents also note that even though petitioners are living in the interior of the United States, and have been doing so for a period of time, they are still legally considered to be at the border because they came into the United States "without being admitted or making entries." Indeed, 8 U.S.C. § 1182(d)(5)(A) states that "such parole of such alien shall not be regarded as an admission of the alien." The concept that aliens who are physically present within in the United States but are nonetheless technically considered to be at the border is known as the "entry fiction" doctrine.

As the Court of Appeals for the Sixth Circuit explained, "[t]his paradox of paroling aliens into the United States yet refusing to recognize their 'entry' into the United States has been termed the 'entry fiction' by some courts." *Rosales–Garcia v. Holland,* 322 F.3d 386, 391 n. 2 (6th Cir.2003). The doctrine stems from the notion that "an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.' " *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953). In *Mezei,* the Supreme Court created an "entry fiction," which extended this distinction to some individuals in the interior of the United States but who, as a result of their status, are deemed technically on the threshold of entry.

Respondents say that because petitioners were paroled into the United States via advance parole, they have not gained ad-

mission into this country and because they have not been admitted, they are no different from an alien who is actually physically present at the border and has not been paroled into the United States.[13] Respondents admit that the only way petitioners can be considered "arriving aliens" is through application of the entry fiction doctrine.

### c.

The Court's initial concern with respondents' position was that neither the expedited removal statute nor the definition of "arriving alien" appears to have been applied to aliens who are deemed arriving aliens *simply or solely* by virtue of the application of the entry fiction doctrine.

As explained in the Court's preliminary injunction order, the literature on expedited removal suggests that with respect to "arriving aliens" the expedited removal statute was intended to allow immigration officers to "summarily return at ports of entry persons who do not have valid travel documents or who attempt entry through fraud or misrepresentation." *See Expedited Removal Study, Evaluation of the General Accounting Office's Second Report on Expedited Removal, Center for Human Rights and International Justice, University of California, Hastings College of Law* (Oct.2000). As the United States General Accounting Office (GAO) explained in its Report to Congressional Committees entitled *Illegal Aliens: Opportunities Exist to Improve the Expedited Removal Process* (GAO/GGD–00–176):

> Under the 1996 Act, on behalf of the Attorney General, the Commissioner of INS carries out the responsibilities to issue expedited removal orders against

---

**13.** The fact that the criminal conspiracy effectively resulted in *paroling* petitioners into the United States with fraudulently obtained advance parole documents is ironic. Had petitioners entered the United States illegally *i.e.* without detection or inspection, it does not appear that they would be subject to expedited removal but rather would be subject to removal under the conventional removal procedure.

aliens classified as "arriving aliens." Justice regulations have defined arriving aliens as those who seek admission to or transit though the United States at a port-of-entry or those who are interdicted in international or U.S. waters and are brought to this country.

The flowchart attached as Exhibit A from the GAO report shows that the expedited removal procedure, for those "arriving aliens" begins when the "alien arrives at a port of entry." The expedited removal system was prompted by Congress's finding that "thousands of aliens *arrive in the U.S. at airports each year* without valid documents and attempt to illegally enter the U.S." H.R.Rep. No. 104–469, pt. 1, at 158 (1996). (emphasis added).

Moreover, the few cases dealing with expedited removal of "arriving aliens" pertain to aliens who actually were detained at a port-of-entry by immigration officials. *Brumme v. Immigration and Naturalization Serv.*, 275 F.3d 443 (5th Cir.2001), involved an alien who was returning to the United States and who was stopped by immigration officials at the Dallas/Ft. Worth Airport where it was discovered her visa was no longer valid. She was then placed in expedited removal proceedings and ordered removed "almost immediately."

In *Li v. Eddy*, 259 F.3d 1132 (9th Cir. 2001), *later vacated as moot*, 324 F.3d 1109 (2003) the alien was stopped by immigration officials in Anchorage on an interim stop on her trip from China to New York. She was determined to have an fraudulent visa and placed in expedited removal proceedings. Significantly, the Court of Appeals for the Ninth Circuit noted that "[i]f the INS were to use these provisions [expedited removal proceedings] or to remove individuals not seeking admission at the border, then its actions would bear no relationship to the statutory authority in section 1225(b)." *Id.* at 1135–36.

**d.**

Following the Court's invitation for the parties to supplement their papers following issuance of the preliminary injunction order, respondents have further developed their position with respect to application of the expedited removal statute to petitioners. Respondents again note that the definition of "arriving alien" appearing in 8 C.F.R. § 1.1(q) includes an alien who has been paroled into the United States ("[a]n arriving alien remains such even if paroled)". Respondents argue that the inclusion of aliens who are paroled into the United States as arriving aliens is significant because the inclusion of paroled aliens expresses "the [Bureau's] intention to cover persons paroled into the United States as arriving aliens.... [and the regulation expresses] 'an immigration enforcement strategy for the interior of the United States.'" Respondents also point out that such an immigration strategy is not novel; including paroled aliens in the definition of arriving aliens is consistent with the entry fiction doctrine.

Respondents also again cite 8 U.S.C. § 1182(d)(5)(A), which states in relevant part that "parole of [an arriving alien] shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served, the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." Respondents say, and the Court agrees, that this provision makes clear that parole and admission are not the same.

Respondents also cite another regulation, 8 C.F.R. § 208.14(c)(4) which provides:

(4) Alien paroled into the United States whose parole has expired or is terminated.

. . . .

(ii) Alien paroled on or after April 1, 1997, without advance authorization for parole. In the case of an applicant who is an arriving alien or is otherwise subject to removal under § 235.3(b) of this chapter, and was paroled into the United States on or after April 1, 1997, without advance authorization for parole prior to departure from the United States, the asylum officer will take the following actions, if the parole has expired or been terminated:

(A) **Inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act. If the applicant appears inadmissible to the United States under section 212(a)(6)(C) or 212(a)(7) of the Act and the asylum officer does not intend to lodge any additional charges of inadmissibility, the asylum officer shall proceed in accordance with § 235.3(b) of this chapter [expedited removal].** If such applicant is found to have a credible fear of persecution or torture based on information elicited from the asylum interview, an asylum officer may refer the applicant directly to an immigration judge in removal proceedings under section 240 of the Act, without conducting a separate credible fear interview pursuant to § 208.30. If such applicant is not found to have a credible fear based on information elicited at the

asylum interview, an asylum officer will conduct a credible fear interview and the applicant will be subject to the credible fear process specified at § 1208.30(b).

This regulation instructs an asylum officer to commence expedited removal proceedings if an alien who is paroled into the United States is inadmissible because of fraud or misrepresentation and if the parole has expired or terminated. Respondents say that this section supports their position that petitioners are subject to expedited removal because every one of them has an expired or terminated parole document. Respondents also note that this section contemplates that expedited removal can be applied to aliens who have been physically present in the United States because it directs an asylum officer to place an alien in expedited removal upon the expiration of their parole if they are deemed inadmissible due to fraud. Clearly, according to respondents, such an alien would have been physically present in the United States for a period of time (during the time of their parole).

Although respondents urge the Court to "defer" to the regulations and find that petitioners are covered by the expedited removal statute, respondents have not satisfied the Court with the authority they cite for such an interpretation. While the regulations, particularly 8 C.F.R. § 208.14(c)(4), may allow for expedited removal of aliens whose parole has expired or terminated, that regulation has not been utilized against petitioners.[14] Respondents

---

**14.** Indeed, a district court recently considered a habeas petition by an individual who properly entered the United States on advance parole. The advance parole had long expired and the individual was taken into custody following a traffic stop and placed in removal proceedings because his parole had expired. The court agreed that "notwithstanding the fact that he has been physically present in the United States for some time, [petitioner] stands in the position of an alien applying for

admission to the United States." *Sillah v. Davis,* 252 F.Supp.2d 589, 594 (W.D.Tenn. 2003). The petitioner in *Sillah,* however, was not placed in expedited removal proceedings but rather had a hearing before an immigration judge. The petitioner also challenged his detention pending removal, not the procedure by which he was being removed. The court determined that petitioner's detention pending removal did not violate due process.

still have not provided any authority to show that expedited removal applies to aliens who are "arriving aliens" based solely on the entry fiction doctrine and who have been residing in the interior of the United States for some time.

In short, respondents have failed to address the situation here. Petitioners were not placed in expedited removal proceedings because their parole had expired—they were placed in expedited removal because of the discovery of the fraudulent scheme. Respondents have sought to justify this action based on petitioners being "arriving aliens" under the entry fiction doctrine. Overall, respondents have not satisfactorily explained that the cited authority supports application of the expedited removal statute to petitioners.

Having determined that the expedited removal statute has not been lawfully applied to petitioners, the next question is whether its unlawful application is unconstitutional.

## 2. Due Process

■ Petitioners argue that the application of the expedited removal statute deprives them of due process. Respondents argue that because petitioners have not technically entered the United States, they have virtually no constitutional rights with respect to their applications or immigration status.

While petitioners' status certainly limits the level of constitutional protections afforded to them, the Sixth Circuit has made clear that even aliens who have not technically entered the United States because of the entry fiction doctrine are nonetheless entitled to a minimum constitutional protection:

> Excludable aliens [15]—like all aliens—are clearly protected by the Due Process Clauses of the Fifth and Fourteenth Amendments:
>
> > The fourteenth amendment to the constitution is not confined to the protection of citizens. It says: "Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.
>
> Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). While we respect the historical tradition of the "entry fiction," *we do not believe it applies to deprive aliens living in the United States of their status as "persons" for the purposes of constitutional due process.*
>
> . . . .
>
> As we understand the entry fiction doctrine, and the Supreme Court's discussion of it in *Zadvydas [v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001)], excludable aliens *are* treated differently for due process purposes that deportable aliens: they are entitled to

---

15. "Excludable aliens" was the term used prior to the enactment of IIRIRA to describe aliens "who were ineligible for admission or entry into the United States." IIRIRA now "refers to inadmissable aliens [8 U.S.C. § 1182(a)] in the place of excludable aliens. Although there are still separate grounds of 'inadmissibility' and 'deportability,' the distinction now turns on whether an alien has been 'admitted' to the United States, rather than on whether the alien gained 'entry.'" *Chi Thon Ngo v. INS,* 192 F.3d 390, 395 n. 4 (3d Cir.1999). "Inadmissible" aliens therefore include aliens who have not entered the United States (formerly considered excludable) and those who, like petitioners, entered illegally (formerly deportable).

less process. In *Landon v. Plasencia,* the Court explained that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." Our cases frequently suggest that a continuously present resident alien is entitled to a fair hearing when threatened with deportation. *Landon,* 459 U.S. at 32, 103 S.Ct. 321[, 74 L.Ed.2d 21] (citations omitted). And in *Mezei,* the Court held that:

> It is true that aliens who have once passed through our gates, even illegally, may be expelled only after *proceedings* conforming to traditional standards of fairness encompassed in due process of law. But an alien on the threshold of initial entry stands on a different footing: "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."

*Mezei,* 345 U.S. at 212, 73 S.Ct. 625[, 97 L.Ed. 956] (citations omitted) (quoting *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950)) (emphasis added). The fact that excludable aliens are entitled to less process, however, does not mean that they are not at all protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. If excludable aliens were not protected by even the substantive component of constitutional due process, as the government appears to argue, we do not see why the United States government could not torture or summarily execute them. Because we do not believe that our Constitution could permit persons living in the United States—whether they can be admitted for permanent residence or not—to be subjected to any government action without limit, we conclude that government treatment of excludable aliens must implicate the Due Process Clause of the Fifth Amendment.

*Rosales–Garcia v. Holland,* 322 F.3d 386, 409–410 (6th Cir.), *cert. denied,* — U.S. ——, 123 S.Ct. 2607, 156 L.Ed.2d 627, 2003 WL 1878569 (U.S. June 23, 2003).

Thus, even though petitioners are excludable aliens, as that term was formerly used, *see* n. 15 *supra,* they are still entitled to some level of due process. This level of due process requires at the least that the immigration laws be properly applied to them—that the procedures utilized against them are lawfully applied. Because the expedited removal procedure does not lawfully apply to petitioners, they have been deprived their minimum due process rights.

### 3. Equal Protection

■ Petitioners also claim that their equal protection rights are being violated by the implementation of expedited removal against persons of Middle Eastern descent. This claim fails. As respondents state:

> the government has not targeted the petitioners for special treatment. On the contrary, the fact that nearly all of the petitioners are being charged with expedited removal and that they are ethnic Arabs is merely a function of the fact that this group purchased fraudulent advance parole documents. In order to make out a non-frivolous claim for an equal protection violation, petitioners would have to point to a similar group of non-Arabs who were not charged with expedited removal despite having similarly purchased fraudulent advance parole documents.

Respondents' brief at p. 28. Petitioners have not pointed to a similarly-situated group of non-Arabs who In any event, petitioners have not made out an equal protection claim.

### 4. Estoppel

■ Petitioners argue that the government should be estopped from cancelling

their advance parole and removing them because they have committed no wrongdoing. The Sixth Circuit has explained the nature of estoppel against the government as follows:

> It is well established that estoppel cannot be used against the government on the same terms as against private parties. *Office of Personnel Management v. Richmond,* 496 U.S. 414, 419, 110 S.Ct. 2465, 2468, 110 L.Ed.2d 387 (1990); [FN 3] *Heckler [v. Community Health Services of Crawford County, Inc.],* 467 U.S. [51] at 60, 104 S.Ct. [2218] at 2224[, 81 L.Ed.2d 42 (1984)]; *United States v. River Coal Co., Inc.,* 748 F.2d 1103, 1108 (6th Cir.1984) (ordinarily the United States is not estopped by acts of individual officers and agents); *Housing Authority of Elliott County v. Bergland,* 749 F.2d 1184, 1190 (6th Cir.1984) (equitable estoppel generally is not available against the government). At the very minimum, some affirmative misconduct by a government agent is required as a basis of estoppel. *Richmond,* 496 U.S. at 421, 110 S.Ct. at 2469; *River Coal,* 748 F.2d at 1108.

---

FN3. While the Supreme Court refused to adopt a flat rule that estoppel may never lie against the government, they noted that they have reversed every finding of estoppel that they have reviewed. The Court further noted that they have never upheld an estoppel claim against the government for the payment of money.

. . . .

A party claiming estoppel must have relied on the government's conduct "in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler,* 467 U.S. at 59, 104 S.Ct. at 2223

*United States v. Guy,* 978 F.2d 934, 937–38 (6th Cir.1992).

Respondents argue that petitioners cannot use estoppel to stop the enforcement of this country's immigration laws any time a government employee exceeds his or her authority and that petitioners had an obligation to make sure that the documents they purchased were bona fide. The Court agrees. Equitable estoppel is not applicable to this habeas case.

### D. The Remedy

■ Having found that the application of expedited removal proceedings to petitioners violates their due process rights, the nature of the remedy must be addressed. Having found that petitioners are not subject to expedited removal does not mean that they are free to remain in the United States. The Bureau is free to institute removal proceedings against petitioners under 8 U.S.C. § 1229a. If the Bureau initiates removal proceedings under section 1229a, the petitioners are free to request their release in accordance with the conventional removal process. The matter of petitioners' release is best directed to the Bureau to consider under the procedures for release pending conventional removal.

■ Indeed, some of the petitioners have recently requested immigration parole (which is the mechanism by which individuals facing removal under 8 U.S.C. § 1229a seek release pending removal). The Bureau, in an abundance of caution, has considered the applications for parole in accordance with the accompanying regulation [16] and has denied them. The Court

---

16. The accompanying regulation is 8 C.F.R. § 212.b(b) which generally allows parole for urgent humanitarian reasons, a significant public benefit, provided the individual does not present a security risk nor a risk of absconding. Pregnancy women, individuals with serious medical conditions, and juveniles may also be eligible for parole. Parole while in expedited removal proceedings, by contrast, is far more limited. An individual may only be paroled for humanitarian reasons or

may not review the Bureaus' discretionary decisions in deciding not to grant parole. *See* 8 U.S.C. § 1226(e); *Loa–Herrera v. Trominski,* 231 F.3d 984, 990 (5th Cir. 2000); *Sol v. INS,* 274 F.3d 648, 651 (2d Cir.2001).

Thus, when all is said and done, the petitioners still face removal to Lebanon. The only difference being the *procedure* by which their removal is to be governed. While the Court's decision may be only a pyrrhic victory for petitioners and probably not the victory for which petitioners may have been hoping. It is a victory nonetheless because they have vindicated their right to have the immigration laws lawfully applied to them. To have denied the petition simply because the end result is the same would have been a result oriented decision and essentially would have been an application of the harmless error doctrine to justify government action. Thus, the fact that the end result might be the same does not diminish its importance. There is an importance to the procedure by which petitioners are removed [17] and petitioners are entitled to be removed under a procedure that properly applies to them.

SO ORDERED.

### *ORDER GRANTING PERMANENT INJUNCTION*

For the reasons stated in the Court's Memorandum and Order of July 23, 2003, the Court hereby PERMANENTLY ENJOINS the Bureau from utilizing the expedited removal procedure against the following petitioners:

Malek Nasser;

Malek Shanine;

where necessary for a legitimate law enforcement objective. *See* 8 C.F.R. § 235.3(b)(iii).

17. "It is procedure that spells out much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to

Ibrahim Naji;

Nabila Jaber;

Kassem Hachem;

Jawdat Nasseredine;

Malek Najer;

Mohammad Fares;

Mohamad Hachem;

Sami Kleit;

Antonie Nasseredine; and

Tamer Mahmoud.

SO ORDERED.

strict procedural safeguards is our main assurance that there will be equal justice under law." *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 179, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Douglas, J., concurring).