**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2159
_____

WENDY AMPARO OSORIO-MARTINEZ Individually and
on behalf of her minor child, D.S.R.-O., and all others
similarly situated; CARMEN ALEYDA LOBO MEJIA,
Individually and on behalf of her minor child, A.D.M.-L., and
all other similarly situated; MARIA DELMI MARTINEZ
NOLASCO, Individually, and on behalf of
her minor child, J.E.L.-M., and all others similarly situated;
JETHZABEL MARITZA AGUILAR MANCIA,
Individually, and on behalf of her minor child,
V.G.R.-A., and all others similarly situated,
                                        Appellants

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA;
SECRETARY UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; ACTING DIRECTOR UNITED
STATES CITIZENSHIP AND IMMIGRATION SERVICES
PHILADELPHIA DISTRICT OFFICE; FIELD OFFICE
DIRECTOR BUREAU OF IMMIGRATION & CUSTOMS
ENFORCEMENT; DIRECTOR BERKS COUNTY
RESIDENTIAL CENTER; UNITED STATES OF
AMERICA; UNITED STATES DEPARTMENT OF
HOMELAND SECURITY

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 5-17-cv-01747)
Honorable Paul S. Diamond, U.S. District Judge
_____

Argued: September 19, 2017

Before: AMBRO, KRAUSE, and SCIRICA, *Circuit Judges*.

(Opinion Filed: June 18, 2018)

Bridget Cambria
Jacquelyn M. Kline
Cambria & Kline
532 Walnut Street
Reading, PA 19601

Carol A. Donohoe
P.O. Box 12912
Reading, PA 19612

Jessica Rickabaugh  **[ARGUED]**
Tucker Law Group
1801 Market Street
Suite 2500
Philadelphia, PA 19103

Anthony C. Vale
Pepper Hamilton LLP
3000 Two Logan Square

18th and Arch Streets
Philadelphia, PA 19013
    *Counsel for Appellants*


Nancy Winkelman
Bruce P. Merenstein
Arleigh P. Helfer III
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, Pa 19103
    *Counsel for Amicus Appellant*

Chad A. Readler
    Assistant Attorney General
William C. Preachey
    Director Office of Immigration Litigation
Erez Reuveni
    Senior Litigation Counsel
Vinita Adrapalliyal
Joseph A. Darrow    **[ARGUED]**
United States Department of Justice
Office of Immigration Litigation
P.O. Box 868
Ben Franklin Station
Washington, DC 20044
    *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

Petitioners, four children of Salvadoran and Honduran origin and their mothers, appear before us for a second time to challenge their expedited orders of removal. In *Castro v. United States Department of Homeland Security*, 835 F.3d 422 (3d Cir. 2016), *cert. denied*, 137 S. Ct. 1581 (2017), we held that we lacked jurisdiction to review their claims under the Immigration and Nationality Act (INA) and that, while the Suspension Clause of the Constitution would allow an aggrieved party with sufficient ties to the United States to challenge that lack of jurisdiction, the petitioners' ties were inadequate because their relationship to the United States amounted only to presence in the country for a few hours before their apprehension by immigration officers. Thus, we affirmed the District Court's dismissal of their petition.

Now, two years after their initial detention, Petitioners raise what, at first glance, appear to be the same claims. But upon inspection they differ in a critical respect: The children now have been accorded Special Immigrant Juvenile (SIJ) status—a protective classification designed by Congress to safeguard abused, abandoned, or neglected alien children who are able to meet its rigorous eligibility requirements. The protections afforded to children with SIJ status include an array of statutory and regulatory rights and safeguards, such as eligibility for application of adjustment of status to that of lawful permanent residents (LPR), exemption from various grounds of inadmissibility, and robust procedural protections to ensure their status is not revoked without good cause.

Because we conclude that the INA prohibits our review just as it did in *Castro*, we are now confronted with a matter of first impression among the Courts of Appeals: Does the jurisdiction-stripping provision of the INA operate as an

unconstitutional suspension of the writ of habeas corpus as applied to SIJ designees seeking judicial review of orders of expedited removal?  We conclude that it does.  As we explained in *Castro*, only aliens who have developed sufficient connections to this country may invoke our Constitution's protections.  By virtue of satisfying the eligibility criteria for SIJ status and being accorded by Congress the statutory and due process rights that derive from it, Petitioners here, unlike the petitioners in *Castro*, meet that standard and therefore may enforce their rights under the Suspension Clause.  Accordingly, we will reverse the District Court's denial of Petitioners' request for injunctive relief.[1]

## I.      Factual and Procedural Background

The eight Petitioners—Wendy Amparo Osorio-Martinez and her three-year-old child D.S. R.-O., Carmen Aleyda Lobo Mejia and her four-year-old child A.D. M.-L., Maria Delmi Martinez Nolasco and her seven-year-old child J.E. L.-M., and Jethzabel Maritza Aguilar Mancia and her sixteen-year-old child V.G. R.-A.—fled physical and sexual violence perpetrated by gangs in their home countries of Honduras and El Salvador.  In September and October of 2015, each family crossed into the United States from Mexico and was apprehended by Customs and Border Patrol within four miles of the border almost immediately thereafter.  They were initially detained in Texas and later moved to a detention center

---

[1] Although Petitioners include both the children and their mothers, all the claims asserted pertain exclusively to the children.  *See* 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c)(1).  As a result, our analysis relates only to the children's right to relief.

5

in Leesport, Pennsylvania. After immigration officers determined that Petitioners were inadmissible, they were each ordered expeditiously removed under 8 U.S.C. § 1225(b)(1). The families requested asylum due to their fear of gang-based violence in their home countries, but their asylum requests were denied by a Department of Homeland Security (DHS) Asylum Officer and affirmed by an Immigration Judge (IJ).[2]

In late 2015, all eight Petitioners, along with twenty-five additional families being held at the detention center, sought habeas relief in the Eastern District of Pennsylvania, challenging their final expedited removal orders and the procedures underlying those orders. *See Castro v. U.S. Dep't of Homeland Sec.*, 163 F. Supp. 3d 157 (E.D. Pa. 2016). In that case, the families claimed that the Asylum Officers and IJs violated their constitutional and statutory rights in the manner that they conducted the "credible fear" interviews. *See id.* at 158. The District Court dismissed their claims, *id.* at 175, and when they appealed we did not reach the merits because we affirmed the District Court's dismissal for lack of subject-matter jurisdiction. *Castro*, 835 F.3d at 425.

---

[2] It appears that their asylum requests were denied at the "credible fear" screening stage based on their inability to demonstrate a nexus between their persecution and their race, religion, nationality, membership in a particular social group, or political opinion as required for asylum eligibility, and not a negative credibility finding as to their stated fear of physical and sexual violence. 8 C.F.R. § 208.13; 8 U.S.C. § 1158; *see also Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 128-29 (3d Cir. 2009).

The key questions in *Castro* were whether the INA, 8 U.S.C. § 1252(e)(2), stripped us of jurisdiction to review the petitioners' claims, and if so, whether such jurisdiction-stripping violated the Suspension Clause of the Constitution. We concluded we did lack jurisdiction under the INA, explaining that, under § 1252(e)(2)(B), we were only permitted to review "whether an immigration officer issued that piece of paper [i.e., the expedited removal order] and whether the Petitioner is the same person referred to in that order." *Castro*, 835 F.3d at 431, 434 (citations omitted). We also concluded that "Petitioners [were] unable to invoke the Suspension Clause" because, "as recent surreptitious entrants deemed to be 'alien[s] seeking initial admission to the United States,'" they lacked any constitutional rights regarding their applications for admission. *Id.* at 448-49 (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)).

That may have seemed the end of the road for the *Castro* petitioners. While the *Castro* litigation was pending, however, the four children here applied for SIJ status. To do so, they first sought and obtained orders from the Berks County Court of Common Pleas "finding that reunification with one or both the parents was not viable due to abuse, neglect, or abandonment, and that it would not be in the child's best interest to be returned to his or her country of origin." App. 7-8. Based on those orders, the children submitted petitions for SIJ status to the United States Citizenship and Immigration Services (USCIS). In late 2016, USCIS approved their petitions and, with the consent of the Secretary of Homeland Security, the children were formally granted SIJ status.

Among other benefits, SIJ status conferred on the children eligibility and the right to apply for adjustment of

7

status to that of lawful permanent residents while within the United States. *See* 8 U.S.C. § 1255(a), (h)(1). At the time they filed those applications, however, visas necessary for their adjustment of status had not yet come available.[3] Thus, for close to two years, the children have been wait-listed, retaining their SIJ classification and awaiting adjustment of their status to LPR. Notwithstanding these developments, however, DHS continued to detain the children and their mothers and to seek their expedited removal—removal to the very countries to which USCIS and the Berks County Court of Common Pleas both found, as part of the SIJ determination, it would not be in the children's best interest to return. The Government's decision to continue seeking removal is particularly noteworthy because, as far as we are aware, until very recently DHS has never attempted to remove SIJ-classified children back to their countries of origin, much less on an expedited basis.

In view of the children's changed status, Petitioners filed a new class action complaint seeking a writ of habeas corpus or injunction to prevent the Government from executing the expedited removal orders against them and to require their release from immigration detention pursuant to those orders, on the ground that their SIJ classification prohibited their expedited removal and continued detention. Petitioners also sought a declaration that their expedited removal violates due

---

[3] Congress has set various limits on the number of visas that may be made available, *see* 8 U.S.C. §§ 1151, 1153, resulting in a waiting list when demand for visas exceeds supply, *see* 8 C.F.R. § 245.1(g)(1). The Government represents that the current waiting list for these SIJ designees is backed up more than two years.

8

process, and an emergency motion for a temporary restraining order. In so doing, Petitioners claimed that their expedited removal violates the Equal Protection and Due Process Clauses of the U.S. Constitution, the Immigration and Nationality Act and its implementing regulations, the Foreign Affairs Reform and Restructuring Act (which implements the Convention Against Torture), and the Administrative Procedure Act. They also asserted a *Bivens* action on the ground that their continued detention violated their Fifth Amendment right not to be illegally detained.[4]

The District Court initially granted Petitioners' request for a temporary restraining order. But the case was then reassigned to a different judge who dissolved the TRO and declined to issue a preliminary injunction, interpreting *Castro* to mean that Petitioners could not succeed on the merits of their claims because the District Court lacked subject-matter jurisdiction to issue a writ of habeas corpus, enjoin Petitioners' removal, or place them in standard removal proceedings. This appeal followed.[5]

---

[4] A *Bivens* action refers to "a private right of action for damages . . . brought directly under the Constitution against federal officials." *Vanderklok v. United States*, 868 F.3d 189, 198 (3d Cir. 2017); *see also Davis v. Passman*, 442 U.S. 228, 248-49 (1979) (recognizing *Bivens* actions under the Fifth Amendment's due process clause).

[5] In September 2017, after the District Court dissolved the TRO and the parties completed briefing the case before us, Petitioners were released from the detention center. Over the Government's objection, IJs held bond hearings for Petitioners and determined that they should be released on "conditional

## II. Standard of Review and Jurisdiction

"In reviewing the grant or denial of a preliminary injunction, we employ a tripartite standard of review: findings of fact are reviewed for clear error, legal conclusions are reviewed de novo, and the decision to grant or deny an injunction is reviewed for abuse of discretion." *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015) (internal quotation marks omitted).

We "have jurisdiction to determine whether we have jurisdiction," *Jarbough v. Att'y Gen.*, 483 F.3d 184, 188 n.3 (3d Cir. 2007), and the central question in this case is whether the federal courts may exercise jurisdiction over Petitioners' claims either under the INA or through invocation of the Suspension Clause.[6] We address these issues in turn.

_____

parole" under 8 U.S.C. § 1226(a)(2)(B), finding that it was "simply inconceivable," Petitioners' 28(j) Letter 1 (Sept. 14, 2017), that Petitioners had been imprisoned for almost two years on a record "completely devoid of any reason, rational or otherwise," justifying their continued detention, *see id.* at 11, 25, 38, 47 (IJs' Bond Memoranda). The Government appealed, and the Board of Immigration Appeals (BIA) issued a stay. As of the date this case was argued, however, Petitioners had not been taken back into custody.

[6] Petitioners' release from physical detention prior to oral argument in this matter does not affect our jurisdiction because, although habeas relief is limited to those "in custody," 28 U.S.C. § 2241(c), the "in custody" inquiry is made "at the time the petition was filed," *Spencer v. Kemna*, 523 U.S. 1, 7 (1998), and, in any event, the limitation "has not required that

## III.    Discussion

The Government asserts that, for all intents and purposes, this case is identical to *Castro* and our holding there dictates the same outcome here.  As we explain below, while we agree with the Government that *Castro* forecloses our jurisdiction under § 1252(e)(2), we conclude that *Castro* supports a different result as to the constitutionality of that

a prisoner be physically confined" so long as the release is "not unconditional," *Maleng v. Cook*, 490 U.S. 488, 491 (1989).  Petitioners' release also does not moot their claim because they can still point to "an actual injury traceable to the defendant[s] and likely to be redressed by a favorable judicial decision," *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990), namely, vacating the expedited orders of removal, *see Chong v. Dist. Dir., INS*, 264 F.3d 378, 385 (3d Cir. 2001) (holding deportation did not moot an alien's habeas petition); *Kamara v. Att'y Gen.*, 420 F.3d 202, 215 n.11 (3d Cir. 2005) (noting that "vacat[ing] the order of removal" may be an appropriate remedy for a habeas petition); *Zalawadia v. Ashcroft*, 371 F.3d 292, 297 (5th Cir. 2004) (granting writ and vacating deportation order because "an appropriate remedy is to vacate or modify the underlying illegal judgment").  Indeed, we have held that an "order of removal creates sufficient collateral consequences to render [an alien's] petition a live case or controversy by preventing her from entering the United States" for a fixed period of time in the future, *Chong*, 264 F.3d at 385, and here, if removed pursuant to expedited removal orders, Petitioners would be inadmissible for at least five years, 8 U.S.C. § 1182(a)(9)(A)(i).

11

jurisdiction-stripping provision as applied to SIJ designees.[7] We will address, first, the question of our jurisdiction under the INA; second, the constitutionality of § 1252(e)(2) under the Suspension Clause as applied to Petitioners; and third, the consequences of our analysis for Petitioners' motion for a preliminary injunction.

## A. Statutory Basis for Jurisdiction

Petitioners' challenge arises at the conflux of two provisions of the INA. On the one hand, as we explained in detail in *Castro*, Congress prescribed expedited removal procedures to facilitate the speedy processing of certain inadmissible aliens, limiting their access to federal courts under § 1252(e)(2) and granting immigration officers virtually unchecked authority to effect their removal. 835 F.3d at 425-27. On the other hand, as Petitioners argue, for certain aliens present in the country, including SIJ designees, Congress has provided for special immigrant classifications, affording them a status and statutory protections that may not be revoked without specified process, including judicial review. *See, e.g.*, 8 U.S.C. §§ 1101(27)(J) *as modified by* Pub. L. No. 110-457, § 235, 112 Stat. 5044 (Trafficking Victims Protection

---

[7] While the Government asserts that SIJ classification "does not itself alter Appellants' legal status," Gov't Br. 6, this argument is belied by the text of the INA, which explicitly designates SIJ as a "status" that affords its designees a host of legal rights and protections. *See* 8 U.S.C. § 1101(a)(27)(J)(iii) (describing SIJ as a "status"); 8 C.F.R. § 204.11(b) (same); 8 U.S.C. § 1255(h) (listing rights); *see also Yeboah v. U.S. Dep't of Justice*, 345 F.3d 216, 221 (3d Cir. 2003) (describing SIJ as a "special status to remain in the United States").

Reauthorization Act of 2008), 1255(h); 8 C.F.R. § 205.2. Because the children have now attained this status, they contend they are exempted from the application of § 1252(e)(2) and the courts retain statutory jurisdiction to review their expedited removal orders. We briefly review the provisions of the INA relevant to expedited removal and to SIJ status before explaining why *Castro* definitively resolved this issue in the Government's favor.

### i. Expedited Removal of Inadmissible Aliens

As a general matter, when an immigration officer determines that an alien "is not clearly and beyond a doubt entitled to be admitted" to the United States, the INA requires that the alien be placed in standard removal proceedings. 8 U.S.C. § 1225(b)(2)(A); *see also id.* § 1229a (standard removal proceedings). Those proceedings take place before an IJ and provide the alien with a variety of procedural protections, including the rights to present evidence, examine the evidence against him, demand reconsideration or reopening of his case, and appeal adverse decisions. *Id.* § 1229a(b)(4)(B), (c)(5), (c)(6), (c)(7); *see also Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 211 (3d Cir. 2017) ("[A]liens in immigration proceedings . . . are entitled to due process of law.").

However, Congress has also provided for a separate form of removal, known as "expedited removal," which permits the accelerated removal of aliens who, according to immigration officers, meet a set of statutorily determined criteria. 8 U.S.C. § 1225(b)(1). Those requirements include: (1) that the alien be "arriving in the United States" or not have been continuously present in the United States for two years;

13

(2) that the alien has "not been admitted or paroled" into the United States; and (3) that the alien either lack valid immigration documentation or have made a misrepresentation in an attempt to attain immigration status. *Id.* Aside from an asylum interview, such aliens are afforded no procedural protections, let alone the various procedural safeguards of standard removal proceedings. *See id.*

As relevant to Petitioners' claims, expedited removal also affects aliens in two other respects. First, the INA tightly constrains judicial review of expedited removal orders, stripping federal courts of jurisdiction to review such orders except on three narrow grounds: (1) whether the petitioner is an alien; (2) whether the petitioner was "ordered removed" under the expedited removal provisions; and (3) whether the petitioner can prove that she has been granted legal permanent resident, refugee, or asylum status. *Id.* § 1252(e)(2). Underscoring the limited scope of the second ground, the statute specifies that the inquiry into whether a petitioner was "ordered removed" may address only "whether such an order in fact was issued and whether it relates to the petitioner." *Id.* § 1252(e)(5). It also bars review of any claim "arising from or relating to the implementation or operation of an order of removal pursuant to [the expedited removal provision]." *Id.* § 1252(a)(2)(A)(i).

Second, expedited removal significantly restricts an alien's eligibility for future admission to the United States, as "[a]ny alien who has been ordered removed under [the expedited removal provisions] . . . and who again seeks admission within 5 years of the date of such removal . . . is inadmissible." *Id.* § 1182(a)(9)(A)(i). And if that alien

14

reenters the United States without being admitted, he or she is then inadmissible for 10 years. *Id.* § 1182(a)(9)(C)(i), (ii).

### ii. Special Immigrant Juvenile Classification

Congress established SIJ status in 1990 in order to "protect abused, neglected or abandoned children who, with their families, illegally entered the United States," *Yeboah v. U.S. Dep't of Justice*, 345 F.3d 216, 221 (3d Cir. 2003); 8 U.S.C. § 1101(a)(27)(J), and it entrusted the review of SIJ petitions to USCIS, a component of DHS. 6 USCIS Policy Manual, pt. J, ch. 1 (Mar. 21, 2018).

Alien children may receive SIJ status only after satisfying a set of rigorous, congressionally defined eligibility criteria, including that a juvenile court find it would not be in the child's best interest to return to her country of last habitual residence and that the child is dependent on the court or placed in the custody of the state or someone appointed by the state. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c). The child must also receive approval from USCIS and the consent of the Secretary of Homeland Security to obtain the status. 8 U.S.C. § 1101(a)(27)(J); Memorandum from Donald Neufeld, Acting Assoc. Dir., Domestic Operations & Pearl Chang, Acting Chief, Office of Policy & Strategy, USCIS, *Trafficking Victims Protection Reauthorization Act of 2008: Special Immigrant Juvenile Status Provisions* 3 (Mar. 24, 2009), https://www.uscis.gov/sites/default/files/USCIS/Laws/Memor anda/Static_Files_Memoranda/2009/TVPRA_SIJ.pdf [hereinafter USCIS Memorandum] (citing H.R. Rep. No. 105-405, at 130 (1997) (Conf. Rep.)).

Once attained, SIJ classification conveys a host of important benefits. For purposes of 8 U.S.C. § 1255(a), which describes adjustment of status, SIJ designees are "deemed . . . to have been paroled into the United States." 8 U.S.C. § 1255(h)(1). Moreover, the INA automatically exempts SIJ designees from a set of generally applicable grounds of inadmissibility and provides that other grounds of inadmissibility also may be waived at the Attorney General's discretion. 8 U.S.C. §§ 1255(h)(2), 1182(a). Of particular note, the INA exempts SIJ designees from inadmissibility based on the lack of "valid entry document[s]," *id.* § 1182(a)(7)(A)(i)(I)—the very ground on which the Government alleges Petitioners are eligible for expedited removal. App. 437 (citing 8 U.S.C. § 1225(b)(1)). Additionally, Congress has granted SIJ designees various forms of support within the United States, such as access to federally funded educational programming and preferential status when seeking employment-based visas. *See id.* §§ 1232(d)(4)(A), 1153(b)(4).

Finally, SIJ status, once granted, may not be revoked except "on notice," 8 C.F.R. § 205.2, and upon the Government's compliance with a series of procedural safeguards: The Secretary of Homeland Security must find "good and sufficient cause" for revocation; the agency must provide notice of intent to revoke; and the SIJ designee must be given the opportunity to present evidence opposing revocation. 8 U.S.C. § 1155; 8 C.F.R. § 205.2; *see also* 7 USCIS Policy Manual, pt. F, ch. 7 (Mar. 21, 2018).

The SIJ designee also has the right to appeal any adverse ruling, initially to the Associate Commissioner for Examinations, 8 C.F.R. § 205.2(d), and then to the extent the

child claims he or she "suffer[ed] legal wrong because of agency action," to the federal courts.  5 U.S.C. § 702; *Yeboah*, 345 F.3d at 220-21; *M.B. v. Quarantillo*, 301 F.3d 109, 111-14 (3d Cir. 2002).[8]

### iii.    Statutory Jurisdiction over Petitioners' Claims

Petitioners argue that their SIJ status qualifies them for the second exception to § 1252(e)(2)'s general bar on judicial review: review of whether the alien was "ordered removed" under the expedited removal provisions.  8 U.S.C. § 1252(e)(2)(B).  That is, expedited removal only applies to "aliens arriving in the United States and certain other aliens who have been admitted or paroled," *id.* § 1225(b)(1), but once

---

[8] As our cases make clear, while discretionary decisions of the Attorney General are not subject to judicial review, federal courts may review under the Administrative Procedure Act, 5 U.S.C. § 702, whether the agency has comported with its own regulations and policies identifying the factors it must consider and the process it must accord. *Compare Quarantillo*, 301 F.3d at 111-14 (judicial review may be permitted where "an agency 'announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed,'" such that there is "some law to apply" (quoting *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996))) *with Jilin Pharm. USA, Inc. v. Chertoff*, 447 F.3d 196, 200 (3d Cir. 2006) (no judicial review for revocation based merely on whether the Secretary of Homeland Security has found "what he deems to be good and sufficient cause" because that determination is entirely committed to agency discretion (quoting 8 U.S.C. § 1155)).

17

Petitioners acquired SIJ status, they were "deemed . . . to have been paroled into the United States."  8 U.S.C. § 1255(h)(1). Therefore, according to Petitioners, their expedited orders of removal are unenforceable; they can no longer be considered "ordered removed"; and there is no statutory bar under § 1252(e)(2) to judicial review and invalidation of the expedited removal orders.

*Castro* forecloses this line of argument.  There, the petitioners likewise argued that we retained jurisdiction to review whether they had been "ordered removed" because they took issue with the validity of the order—in that case because they claimed the asylum officer and the IJ conducted their credible fear interviews in a manner that violated their constitutional and statutory rights.  *Castro*, 835 F.3d at 428, 430.  We held that jurisdiction was precluded by § 1252(e)(5), which provides:

> In determining whether an alien has been ordered removed under section 1225(b)(1) of this title [the expedited removal provision], the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner.  There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

8 U.S.C. § 1252(e)(5).  We held that the first sentence "clearly evince[s] Congress' intent to narrowly circumscribe judicial review of issues relating to expedited removal orders," and that the second sentence further "clarifies the narrowness of the inquiry under the first sentence, i.e., that review should only be for whether an immigration officer issued that piece of paper

18

and whether the Petitioner is the same person referred to in that order." *Castro*, 835 F.3d at 431 (citation omitted). Yet Petitioners here, as in *Castro*, seek review beyond those two extraordinarily narrow grounds. They do not contest that the order was issued or that it relates to them; rather, their claim is that the order is being illegally applied to them. No fair reading of *Castro* permits that inquiry.

Moreover, *Castro* indirectly confronted, and rejected, an argument nearly identical to Petitioners' parole argument when it discounted the reasoning of *American-Arab Anti-Discrimination Committee v. Ashcroft*, 272 F. Supp. 2d 650 (E.D. Mich. 2003). *Castro*, 835 F.3d at 432. Just as Petitioners here argue that they are "paroled" and therefore exempted from expedited removal by the terms of the statute, the petitioners in *American-Arab*—a group of Lebanese citizens against whom expedited removal proceedings had commenced—argued that they were not "arriving aliens" and therefore were ineligible for expedited removal. 272 F. Supp. 2d at 664. In that case, the court agreed with the petitioners, focusing on the fact that § 1252(e)(5) directs the "ordered removed" inquiry to "whether [the order] relates to the petitioner," and then concluding that review of whether the statute was "lawfully applied is a review of the question of whether an order of expedited removal has been entered against them and whether the order 'relates' to the individual." *Id.* at 663. But in *Castro* we found that court's "construction of the statute to be not just unsupported, but also flatly contradicted by the plain language of the statute itself." 835 F.3d at 432.

In an attempt to distinguish *Castro*, Petitioners argue that they "do not challenge the entry of their expedited removal orders," but rather take issue with "actions by the Government

after the orders issued," i.e., whether the Government can circumvent the processes required by statute and regulation to achieve de facto revocation of Petitioners' SIJ status by effectuating their expedited removal. Pet'r Br. 25. But § 1252 not only strips the courts of the ability to review the orders themselves, but also to review "any other cause or claim arising from or relating to the implementation or operation of" such an order. 8 U.S.C. § 1252(a)(2)(A)(i). "Relating to" is typically construed as having a broad, expansive meaning, including in the immigration context. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("The ordinary meaning of these words ['relating to'] is a broad one."); *Aguilar v. U.S. Immigration. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 10 (1st Cir. 2007) (suggesting that, for purposes of a different provision of § 1252, "relating to" could be used to mean "to sweep within its scope claims with only a remote or attenuated connection" to the underlying removal). Furthermore, "arising from or relating to" must be interpreted broadly because we are reading the phrase in the context of a statutory scheme that is "aimed at protecting the Executive's discretion from the courts." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999). With these considerations in mind, Petitioners' claims as to the effect of their SIJ status on the enforceability of their expedited orders of removal do "arise from" or "relate to" those orders.

In sum, Petitioners seek a judgment holding that the orders are unenforceable, but as *Castro* and the plain language of § 1252 make clear, these claims fall within the ambit of the jurisdiction-stripping provision.

## B.     Constitutional Basis for Jurisdiction

Because we conclude that the INA strips the federal courts of jurisdiction to review Petitioners' challenge to their expedited removal orders, we must confront a second question, this one of constitutional dimension: Does the stripping of federal court jurisdiction to hear the claims of these children violate the Suspension Clause?  In view of their SIJ status and the significant connections to the United States that it entails, we hold today that it does.[9]

The Suspension Clause forbids suspension of the writ of habeas corpus "unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. I, § 9, cl. 2.  To determine whether a jurisdiction-stripping statute violates the Clause, we proceed, as in *Castro*, through the two-step analysis that the Supreme Court announced in *Boumediene v. Bush*, 553 U.S. 723 (2008).  We first determine

---

[9] In a recent concurrence, Justice Thomas argued that the Suspension Clause should be unavailable to alien-petitioners who claimed a right to bail hearings and sought only "declaratory and injunctive relief," but did not invoke § 2254 or request release from custody.  *Jennings v. Rodriguez*, 138 S. Ct. 830, 858 (2018) (Thomas, J., concurring).  That view has not been adopted by a majority of the Court, but even assuming it is correct, it would not preclude jurisdiction here because Petitioners did seek habeas relief in their initial complaint, and, to the extent they request a stay of their expedited removal orders, that relief is ancillary to the primary relief they seek: release from the detention and from the expedited removal authorized by their orders of removal under § 1225(b)(1).

"whether a given habeas petitioner is prohibited from invoking the Suspension Clause due to some attribute of the petitioner or to the circumstances surrounding his arrest or detention." *Castro*, 835 F.3d at 445 (citing *Boumediene*, 553 U.S. at 739).[10]  Then, if the petitioner is not prohibited from invoking the Suspension Clause, we "turn to the question whether the substitute for habeas is adequate and effective to test the legality of the petitioner's detention (or removal)." *Id.* at 445 (citing *Boumediene*, 553 U.S. at 739).

---

[10] At the first step of the inquiry, the *Boumediene* Court considered three sets of factors to determine that detainees at Guantanamo Bay may seek the writ: "(1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ." *Boumediene*, 553 U.S. at 766. Although, following *Castro*, we do not assess all of these factors here, we are confident that they would similarly lead us to conclude that Petitioners may invoke the Suspension Clause. Like the "status of the detainee[s]" at Guantanamo Bay, Petitioners' "status" as SIJ designees militates against denial of the writ. *Id.*  As to the second and third factors relevant to determining the reach of the Suspension Clause, Petitioners were not apprehended or detained outside United States territory, *see Johnson v. Eisentrager*, 339 U.S. 763, 777 (1950), nor are there serious practical obstacles to permitting habeas corpus proceedings besides the kind of "incremental expenditure of resources" that the Supreme Court deemed not dispositive to the question of granting the writ, *Boumediene*, 553 U.S. at 769.

In *Castro*, we determined that the Suspension Clause was not violated where aliens, apprehended within hours of entering the country, were denied review of their expedited removal orders. *Id.* at 445-46. We explained that the petitioners there could not overcome the INA's jurisdiction-stripping provisions based on "physical presence alone," *id.* at 448, but we explicitly "le[ft] it to courts in the future to evaluate the Suspension Clause rights of an alien whose presence in the United States goes meaningfully beyond that of Petitioners here," *id.* at 448 n.30. *Castro* anticipated circumstances like those with which we are presented today, and it foreshadowed the outcome: Because SIJ status reflects Petitioners' significant ties to this country and Congress's determination that such aliens should be accorded important statutory and procedural protections, Petitioners are entitled to invoke the Suspension Clause and petition the federal courts for a writ of habeas corpus. We further conclude that because the expedited removal regime does not provide an adequate substitute process, the INA's jurisdiction-stripping provisions effect an unconstitutional suspension of the writ as applied to Petitioners. We address the *Boumediene* steps in sequence.

### i. *Boumediene* Step One

We begin, as we did in *Castro*, by asking whether Petitioners are "prohibited from invoking the Suspension Clause due to some attribute of the petitioner[s] or to the circumstances surrounding [their] arrest or detention." *Castro*, 835 F.3d at 445 (citing *Boumediene*, 553 U.S. at 739). There, we resolved the petitioners' claims at the first step of the *Boumediene* analysis based on the Supreme Court's "unequivocal[] conclu[sion] that 'an alien seeking initial

23

admission to the United States requests a privilege and has no constitutional rights regarding his application.'" *Id.* (quoting *Landon*, 459 U.S. at 32). Recognizing that "initial admission" in *Landon* can be read to mean "initial entry,"[11] we decided

---

[11] We noted in *Castro* that "'initial admission' in *Landon* may simply be synonymous with 'initial entry,'" such that no meaning can be inferred from the fact that the Court "did not categorize aliens based on whether they have entered the country or not" but instead did so based "on whether the aliens are 'seeking initial admission to the United States.'" *Castro*, 835 F.3d at 449 n.31 (emphasis omitted) (quoting *Landon*, 459 U.S. at 32). This is clearly the correct reading, and not merely because the *Landon* Court relied on *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), a case about entry, for the proposition that an "alien seeking initial admission" has no constitutional rights, *Landon*, 459 U.S. at 32. More to the point, *Landon* was decided in 1982, well before Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) (IIRIRA), that, for the first time, defined admission in terms of "lawful entry." That *Landon* intended its pre-IIRIRA references to "admission" as references to entry of any kind, lawful or not, is reinforced by the direct contrast the Court draws between an alien "seeking admission" and an alien "already physically in the United States" to explain the distinction between deportation and exclusion proceedings. *See Landon*, 459 U.S. at 25. Unsurprisingly, the pre-IIRIRA landscape is replete with references to this binary, as well as interchangeable uses of "admission" and "entry." *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 175 (1993) ("It is important to note at the outset that our immigration laws have long made a

that aliens "apprehended within hours of surreptitiously entering the United States" are properly treated as aliens "seeking initial admission" and that they therefore "cannot invoke the Constitution, including the Suspension Clause, in an effort to force judicial review beyond what Congress has already granted them." *Id.* at 445-46. But our reasoning in *Castro* leads to the opposite conclusion here because, as SIJ designees, Petitioners are readily distinguished from aliens "'on the threshold of entry' who clearly lack constitutional due process protections concerning their application for admission." *Id.* at 444 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)).

In *Castro*, we considered the Supreme Court's statement in *Landon* that "once an alien gains admission to our country *and begins to develop the ties that go with permanent residence* his constitutional status changes accordingly." *Id.* at 448 (quoting *Landon*, 459 U.S. at 32 (emphasis added by *Castro*)). And we also looked to *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), where the Court maintained that "aliens receive constitutional protections when they have come within the territory of the United States *and developed substantial connections with this country*." *Castro*, 835 F.3d at 448 (quoting *Verdugo-Urquidez*, 494 U.S. at 271 (emphasis added by *Castro*)); *see also Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) ("The alien, to whom the United States has been traditionally hospitable, has been accorded a

---

distinction between those aliens *who have come to our shores seeking admission*, such as petitioner, and those *who are within the United States after an entry*, irrespective of its legality." (emphasis added) (quoting *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958)).

25

generous and ascending scale of rights as he increases his identity with our society." (quoting *Eisentrager*, 339 U.S. at 770-71)). Noting these precedents and the Court's consistent emphasis on the relationship between alien and country, we concluded that—although physical presence in the country for any duration may be relevant—presence alone, particularly of short duration, cannot be sufficient to establish that an alien is entitled to constitutional protections, especially given "Congress' and the Executive's plenary power over decisions regarding the admission or exclusion of aliens"; consequently, we rejected the petitioners' attempts to use constitutional protections to shield themselves from expedited removal. *See Castro*, 835 F.3d at 448-50 & n.30.

In contrast, Petitioners here have developed the "substantial connections with this country," *Verdugo-Urquidez*, 494 U.S. at 271, that "go with permanent residence," *Landon*, 459 U.S. at 32. That is because, as explained below, (1) these children have satisfied rigorous eligibility criteria for SIJ status, denoting them as wards of the state with obvious implications for their relationship to the United States; (2) Congress accorded these children a range of statutory and procedural protections that establish a substantial legal relationship with the United States; (3) with their eligibility for application for permanent residence assured and their applications awaiting only the availability of visas (a development that is imminent by the Government's calculation) and the approval of the Attorney General, these children have more than "beg[un] to develop the ties that go with permanent residence," *Castro*, 835 F.3d at 448 (quoting *Landon*, 459 U.S. at 32); and (4) in contrast with the circumstances in *Castro*, recognition of SIJ designees'

26

connection to the United States is consistent with the exercise of Congress's plenary power.

## 1. Eligibility Criteria

We begin with the requirements for SIJ status that "show a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for LPR status," *Garcia v. Holder*, 659 F.3d 1261, 1271 (9th Cir. 2011), and that, in effect, establish a successful applicant as a ward of the United States with the approval of both state and federal authorities, *see Yeboah*, 345 F.3d at 221; 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11.

This understanding of SIJ status is reflected in the very definition of a Special Immigrant Juvenile, i.e., a child "who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." 8 U.S.C. § 1101(a)(27)(J)(i). It is also compelled not only by the statute's purpose and history, *see Yeboah*, 345 F.3d at 221 (recognizing that Congress established SIJ status "to protect abused, neglected, or abandoned children who, with their families, illegally entered the United States"); *see also* Conference Report on H.R. 2267, Sec. 113, Congressional Record, House of Representatives, 143 Cong. Rec. H10809-01 (November 13, 1997) (observing that the statutory language was modified "in order to limit the beneficiaries . . . to those juveniles for whom it was created, namely abandoned,

27

neglected, or abused children"), but also by DHS's own characterization of SIJ status as a "classification to provide humanitarian protection for abused, neglected, or abandoned child immigrants eligible for long-term foster care," 6 USCIS Policy Manual, pt. J, ch. 1 (Mar. 21, 2018). And the SIJ statute's implementing regulations indicate that, to remain eligible for adjustment of status pending visa availability, SIJ designees must remain in the custody of the state court or state agency to which they have been committed. *See* 8 C.F.R. § 204.11(c)(5) (noting that to be eligible for SIJ status, an alien must "*continue*[] to be dependent upon the juvenile court and eligible for long-term foster care" (emphasis added)); *see also* Special Immigrant Juvenile Petitions, 76 Fed. Reg. 54978-01, 54980 (proposed Sept. 6, 2011) (to be codified at 8 C.F.R pts. 204-05, 245) (noting that "dependency," for purposes of SIJ status, "encompasses dependency, commitment, or custody").

Importantly, that close, dependency relationship with the United States is also borne out by the statutory criteria for SIJ eligibility. To qualify for SIJ status, applicants not only must be physically present in the United States, unmarried, and under the age of twenty-one, but also, before applying to USCIS, they must obtain an order of dependency from a state juvenile court. 8 U.S.C. § 1101(a)(27)(J)(i); 8 C.F.R. § 204.11(c). That order requires the state court to find: (1) that the applicant is "dependent on a juvenile court . . . or placed under the custody" of a state agency or someone appointed by the state; (2) that "it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or . . . habitual residence,"; and (3) that "reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." 8 U.S.C. § 1101(a)(27)(J)(i), (ii); *see*

28

*also* 8 C.F.R. § 204.11(a), (c). Moreover, these determinations must be "in accordance with state law governing such declarations of dependency," 8 C.F.R. § 204.11(c)(3), which, depending on the state, may also entail specific residency requirements, *e.g.*, Pa. R. Civ. P. § 1915.2(a)(ii) (providing that the dependency action must be brought in the child's home county or a county "which had been the child's home county within six months before commencement of the proceeding"). [12] Petitioners themselves had resided in Pennsylvania for more than six months before seeking their state court dependency declarations. *See* Tr. of Oral Arg. 64:6-9 ("The reason that they got SIJ status, they had to be here for at least six months under Pennsylvania law to even go to seek a predicate order for SIJ status through the state courts.").

With that order in hand, applicants must then file an application with USCIS, along with "sufficient evidence to establish . . . eligibility" and the associated filing fee. 6 USCIS Policy Manual, pt. J, ch. 4 (Mar. 21, 2018); *see also* USCIS, Petition for Amerasian, Widow(er), or Special Immigrant

---

[12] Aside from residency, states impose a variety of requirements to establish dependency over and above those required by the terms of the SIJ statute, reinforcing that an order of dependency reflects an independent relationship between the SIJ applicant and the state. *See, e.g.*, *In re Erick M.*, 820 N.W.2d 639, 648 (Neb. 2012) (requiring a showing that reunification with neither parent is feasible, rather than reunification with *either* parent, as the SIJ statute requires); *O.I.C.L. v. Dep't of Children & Families*, 169 So. 3d 1244, 1249 (Fla. Dist. Ct. App. 2015) (requiring a showing that the abuse was not "too remote in time").

(Form I-360), https://www.uscis.gov/i-360.  The Secretary of Homeland Security must also consent to the grant of SIJ status, which functions as "an acknowledgement that the request for SIJ classification is bona fide"—that is, that the benefit is "'sought primarily . . . for the purpose of obtaining relief from abuse or neglect or abandonment.'"  USCIS Memorandum 3 (quoting H.R. Rep. No. 105-405, at 130); *see also* 8 U.S.C. § 1101(a)(27)(J).

All of these requirements attest to SIJ designees' dependency and close ties with state and federal authorities, the risk to their well-being in being removed to their countries of origin, and a relationship to the United States that far exceeds that of aliens "on the threshold of initial entry" or "apprehended within hours of surreptitiously entering the United States."[13]  *Castro*, 835 F.3d at 444-45.

---

[13] This is not to suggest that aliens must be accorded a formal statutory designation and attendant benefits to lay claim to "substantial connections" to this country, or indeed, that an alien must have such connections to invoke the Suspension Clause.  *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 202 (D.C. Cir. 2001) (pointing out that *Verdugo-Urquidez* did not state that "only" individuals who have "substantial connections" are entitled to constitutional protections and, in concluding that the appellant had developed such connections, declining to undertake "as a general matter . . . how 'substantial' an alien's connections with this country must be" to merit constitutional protections).  We need not address here what minimum requirements aliens must meet to lay claim to constitutional protections.  We hold merely that SIJ designation and the relationship to the United States to which it attests are more than sufficient.

### 2. Legal Relationship with the United States

SIJ status also reflects the determination of Congress to accord those abused, neglected, and abandoned children a legal relationship with the United States and to ensure they are not stripped of the opportunity to retain and deepen that relationship without due process. *See Garcia*, 659 F.3d at 1271 (describing SIJ status as a "special recognition and opportunity to make contacts in this country").

That is, with the protections it afforded those with SIJ status, Congress provided opportunities for this class of aliens to strengthen their connections to the United States, pending a determination on their applications for adjustment of status. Not only are SIJ designees "deemed, for purposes of [adjustment of status to lawful permanent resident under § 1255(a)], to have been paroled into the United States,"[14] 8

---

[14] Much ink has been spilled in this case over one of the underlying merits questions: whether "deemed, for purposes of [§ 1255(a)], to have been paroled," 8 U.S.C. § 1255(h)(1), qualifies SIJ designees as "paroled" for any other purpose in the INA. Specifically, Petitioners contend that because they are "deemed . . . paroled" by virtue of their SIJ status, they are now categorically exempt from expedited removal, which applies only to "aliens arriving in the United States . . . who have not been admitted or paroled." *Id.* § 1225(b)(1). From this perspective, reading "deemed" to diminish the word it modifies would be inconsistent with its plain meaning of to "judge" or to "classify," *Deem*, Webster's Third New International Dictionary 589 (1964), and with the use of the

31

term elsewhere in the INA, *see, e.g.*, 8 U.S.C. § 1182(a)(9)(B)(ii); *id.* § 1226a(a)(7), and in case law, *see, e.g.*, *Centurion v. Holder*, 755 F.3d 115, 120 (2d Cir. 2014); *Othi v. Holder*, 734 F.3d 259, 267 (4th Cir. 2013); *Joubert v. Barnhart*, 396 F. Supp. 2d 1320, 1326 (S.D. Fla. 2005). The Government, on the other hand, emphasizes that § 1255(h)(1) accords parole "for purposes of [§ 1255(a)]" and argues that the District Court was correct to conclude being "deemed . . . paroled" is a "legal fiction created only to allow DHS to determine whether an alien is eligible for an immigrant visa *under § 1255(a)*," Gov't Br. 24-25 (quoting *Osorio-Martinez et al. v. Att'y Gen.*, No. 5:17-cv-01747, at *10 (E.D. Pa. May 23, 2017)). From that perspective, Congress made a distinction between those "deemed, for purposes of [§ 1255(a)], to have been paroled" in 8 U.S.C. § 1255(h)(1) and those granted "parole" under 8 U.S.C. § 1182(d)(5)(a), and, as the Government would have it, intended to exempt only the latter from expedited removal when it limited § 1225(b)(1) to those "not . . . admitted or paroled." The merits of these arguments, however, are not what we must resolve today: For our purposes, even assuming that SIJ designees are deemed "paroled" for no other purpose than adjustment of status under § 1255(a), Congress expressly exempted only SIJ designees and aliens who served honorably in active duty in the United States military from § 1255(a)'s general requirement that aliens be "admitted or paroled into the United States" before applying for adjustment of status, *id.* §§ 1255(h)(1), 1255(g)— a significant benefit that supports the substantial legal relationship of SIJ designees with the United States and, hence, their ability to invoke the Suspension Clause and obtain judicial review.

32

U.S.C. § 1255(h)(1), but Congress also enlarged the chance that Petitioners would be successful in their applications for adjustment by exempting them from a host of grounds that would otherwise render them inadmissible—including being found to be a "public charge," lacking a "valid entry document," or having "misrepresented a material fact"—while seeking admission into the United States, *id.* § 1182(a); *see also id.* § 1255(h)(2)(A). Similarly, Congress conferred on SIJ designees a variety of other statutory benefits that deepen the ties of those permitted to remain in the United States while they await that adjustment of status, such as access to federally funded educational programming, *see id.* § 1232(d)(4)(A), and preferential status when seeking employment-based visas, *see id.* § 1153(b).

In addition, Congress also afforded these aliens a host of procedural rights designed to sustain their relationship to the United States and to ensure they would not be stripped of SIJ protections without due process. SIJ status may be revoked only for what the Secretary of Homeland Security deems "good and sufficient cause." 8 U.S.C. § 1155; 8 C.F.R. § 205.2; *see also* 7 USCIS Policy Manual, pt. F, ch. 7 (Mar. 21, 2018). Even then, revocation must be "on notice," meaning that the agency must provide the SIJ designee with "notice of intent" to revoke, an "opportunity to offer evidence . . . in opposition to the grounds alleged for revocation," a "written notification of the decision that explains the specific reasons for the revocation," and the option to file an appeal within the agency. 8 C.F.R. § 205.2. SIJ designees are also entitled to judicial review to the extent they challenge actions not "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), including the agency's application of the SIJ criteria and compliance with specified procedures. *See Quarantillo*, 301 F.3d at 111-14

33

(judicial review available for denial of SIJ status based on 8 C.F.R. § 204.11(c) factors); *Yeboah*, 345 F.3d at 220, 222 n.5 (same); *Ghaly v. INS*, 48 F.3d 1426, 1436-37 (7th Cir. 1995) (judicial review available for revocation of status under 8 C.F.R. § 205.2); *cf. Jilin Pharm.*, 447 F.3d at 200 (no judicial review for whether the Secretary of Homeland Security has found "what he deems to be good and sufficient cause" because it is committed to agency discretion under 8 U.S.C. § 1155).

Yet revocation of these statutory rights without cause, notice, or judicial review is precisely the consequence of expedited removal. Despite their SIJ classification, the children, once removed, would be unable to adjust status because doing so requires physical presence within the United States, *see* 8 U.S.C. § 1255(a), and further, they would be barred from reentry for at least five years, *see id.* § 1182(a)(9)(A)(i); 22 C.F.R. § 40.91(a). [15] Moreover,

---

[15] The Government points out that 8 U.S.C. § 1182(a)(9)(A)(iii) allows the Director of USCIS to waive Petitioners' inadmissibility. But this is a small comfort indeed, as the grant or denial of such a waiver is an unreviewable discretionary decision, *see* 8 U.S.C. § 1252(a)(2)(B), has no fixed timeline by which waiver applications must be processed, USCIS, Application for Permission to Reapply for Admission Into the United States After Deportation or Removal (Form I-212), https://www.cbp.gov/travel/international-visitors/ admission-forms/form-i-212-application-permission-reapply- admission-united-states-after (informing applicants that review of a request to waive inadmissibility "can take up to six months or longer"), costs applicants many hundreds of dollars in fees, USCIS, Instructions for Application for Permission to Re-apply for Admission Into the United States After

34

Petitioners' expedited removal would be based on a ground for inadmissibility—lack of valid immigration documentation, *see* 8 U.S.C. § 1182(a)(7)(A)—from which Petitioners are expressly exempted by virtue of their SIJ status, *see id.* § 1255(h)(2)(A). In short, expedited removal would render SIJ status a nullity.

And beyond the direct repudiation of the statutory rights of SIJ designees, expedited removal would also implicate constitutional due process concerns. In *Yeboah* we observed that in deciding whether to grant a juvenile alien consent to go before a state juvenile court for a dependency hearing, as required to obtain SIJ status, "[t]he INS Director's discretion is bound only by due process considerations." 345 F.3d at 223. We explained that, "[a]s a juvenile alien, [the petitioner] has the *right* to have his request for a dependency hearing considered in accordance with INS policy." *Id.* (emphasis added); *see also Gao v. Jenifer*, 185 F.3d 548, 557 (6th Cir. 1999) (SIJ status confers "a meaningful legal benefit"). More generally, we recognized in *Dia v. Ashcroft* that "[t]he due process afforded aliens stems from those statutory rights granted by Congress and the principle that '[m]inimum due

Deportation or Removal (Form I-212), at 15, https://www.uscis.gov/sites/default/files/files/form/i-212instr.pdf (noting that filing fee for waiver of inadmissibility is $930), and even in the case of approval would still only result in relief after Petitioners waited in queue for available visas, which the Government informs us are currently backlogged by at least two years, Gov't Br. 26. And perhaps most importantly, there is no affirmative reason to believe such a waiver would be granted at all.

35

process rights attach to statutory rights.'" 353 F.3d 228, 239 (3d Cir. 2003) (quoting *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996)).

Moreover, while the creation of statutory rights associated with a given immigration status falls exclusively within the purview of Congress, it bears mention that the Executive to this point has consistently respected those rights and allowed SIJ designees to remain in the United States pending adjustment of status. Although the INA allows the DHS to expeditiously remove certain aliens apprehended up to two years after entering the United States and who were encountered anywhere within United States territory, *see* 8 U.S.C. § 1225(b)(1), it apparently has not, until recently, sought even standard removal, much less expedited removal, of SIJ designees while their applications for adjustment of status were pending, App. 284.[16] To the contrary, under

_____

[16] Notably, the agency has traditionally limited the application of expedited removal to aliens "encountered within 14 days of entry without inspection and within 100 air miles of any U.S. international land border." Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01, 48879 (Aug. 11, 2004). The President has recently directed the Secretary of DHS to "take appropriate action to apply" expedited removal proceedings "to aliens designated under [8 U.S.C. § 1225(b)(1)(A)(iii)(II)]," Exec. Order No. 13,767, 82 Fed. Reg. 8793 (Jan. 25, 2017), and, while it appears that SIJ designees cannot lawfully be subjected to such proceedings in any event for the reasons we explain here, even if they could, the Secretary has not yet published any notice of a new policy. *See* Memorandum from John Kelly, Sec'y of U.S. Dep't of Homeland Sec. to Kevin McAleenan, Acting Comm'r of U.S.

USCIS policy, if a "SIJ is in removal proceedings, the immigration court must terminate [removal] proceedings before USCIS can adjudicate the adjustment application." 6 USCIS Policy Manual, pt. J, ch. 4 n.2 (Mar. 21, 2018). Similarly, the BIA has made clear its conclusion that even mere applicants for SIJ status—let alone children who have already received SIJ status—should not be removed from the country, as it has repeatedly held that "[a]bsent evidence of an alien's ineligibility for SIJ status, an Immigration Judge should, as a general practice, continue proceedings to await adjudication of a pending state dependency petition," *In re Adelina Gonzalez-Morales*, A206 453 127, 2015 WL 4873234, at *1 (BIA July 2, 2015); *accord In re Johan Fuentes*, A202 005 328, 2015 WL 4510742, at *1 (BIA June 19, 2015); *In re Maria Georgina Martinez-Mendoza*, A206 732 194, 2015 WL 3896298, at *2 (BIA June 1, 2015). The Chief Immigration Judge has likewise instructed IJs that "if an unaccompanied child is applying for Special Immigrant Juvenile . . . status, the case must be administratively closed or reset for that process to occur in the appropriate state or juvenile court." [17] Memorandum from

---

Customs and Border Prot. et al., *Implementing the President's Border Security and Immigration Enforcement Improvements Policies* 7 (Feb. 20, 2017) (stating that DHS "will publish in the *Federal Register* a new Notice Designating Aliens Subject to Expedited Removal . . . , which may, to the extent I determine is appropriate, depart" from current limitations).

[17] We note that the Attorney General recently issued a decision instructing IJs and the BIA that cases should be "administratively closed" only where expressly authorized by regulation or judicially approved settlement and explaining that "[c]ases that should not go forward should be terminated

Brian M. O'Leary, Chief Immigration Judge, Exec. Office for Immigration Review, U.S. Dep't of Justice, to All Immigration Judges, *Docketing Practices Relating to Unaccompanied Children Cases and Adults with Children Released on Alternatives to Detention Cases in Light of the New Priorities* 2 (Mar. 24, 2015) [hereinafter O'Leary Memorandum].

In sum, because Petitioners enjoy at least "minimum due process rights" by virtue of their SIJ designation, this case stands in stark contrast to the key precedents we relied on in *Castro*—two Cold War-era decisions about aliens detained on Ellis Island at the threshold of entry—to conclude that aliens apprehended within hours of entering the country could not lay claim to constitutional rights and could not invoke the Suspension Clause. 835 F.3d at 444, 447-48 (citing *Knauff*, 338 U.S. at 544, and *Mezei*, 345 U.S. at 212). Instead, the facts before us more resemble those in *Khouzam v. Attorney General*, where we held that neither *Mezei* nor *Knauff* was applicable for purposes of determining whether an alien "detained immediately upon arrival without proper documentation" was entitled to due process because the alien "ha[d] already been granted statutory relief from removal." 549 F.3d 235, 256 (3d Cir. 2008) (citations omitted). Here, likewise, the children's statutory rights and attendant constitutional rights as SIJ designees bespeak a substantial legal relationship between them and the United States—a

---

(either with or without prejudice), or dismissed," or upon a showing of good cause, handled by way of "continuance[] . . . for a fixed but potentially renewable period of time." *Matter of Castro-Tum*, 27 I. & N. Dec. 271, 291 (Att'y Gen. 2018) (quoting 8 C.F.R. § 1003.29).

relationship far more significant than what we considered upon the petitioners' initial entry in *Castro*.[18]

### 3. Relationship to Lawful Permanent Resident Status

Because of the rights and benefits they have been accorded, SIJ designees stand much closer to lawful permanent residents than to aliens present in the United States for a few hours before their apprehension. Indeed, Petitioners are a hair's breadth from being able to adjust their status, pending only the availability of immigrant visas and the approval of the

---

[18] We do not suggest that habeas relief is contingent on a prior determination of the due process rights of a detainee. *See* Gerald L. Neuman, *The Habeas Corpus Suspension Clause After* Boumediene v. Bush, 110 Colum. L. Rev. 537, 574 (2010) (noting that in *Boumediene*, "the Supreme Court found that the Guantanamo detainees were protected by the Suspension Clause without first inquiring whether they had rights under the Due Process Clause"). Nor must we precisely ascertain the extent or nature of Petitioners' statutory or due process rights and the relationship between these rights and the Suspension Clause. *See* Martin H. Redish & Colleen McNamara, *Habeas Corpus, Due Process and the Suspension Clause: A Study in the Foundations of American Constitutionalism*, 96 Va. L. Rev. 1361, 1364 (2010) ("[T]he relationship between the Suspension and Due Process Clauses remains completely unsettled."). While aliens who lack constitutional rights of any kind are precluded from invoking the Suspension Clause, those who enjoy the statutory and due process rights that accompany SIJ status are not.

Attorney General.[19] *See* 8 U.S.C. § 1255(a). This proximity to LPR status is significant because the lawful permanent resident is the quintessential example of an alien entitled to "broad constitutional protections." *Castro*, 835 F.3d at 447; *see also Kwong Hai Chew*, 344 U.S. at 596 ("[A] lawful permanent resident of the United States . . . physically present there . . . may not be deprived of his life, liberty or property without due process of law."). And once immigrant visas become available and Petitioners attain LPR status, there is no question that they would be excepted from the INA's jurisdiction-stripping provision, such that any attempt to enforce removal orders previously issued against them would be subject to our review. 8 U.S.C. § 1252(e)(2)(C) (allowing judicial review as to whether the petitioner is "an alien lawfully admitted for permanent residence"); *see also* Memorandum from William R. Yates, Assoc. Dir. for Operations, USCIS, to Regional and District Directors, *Memorandum #3 – Field Guidance on Special Juvenile Status Petitions* 2 (May 27, 2004) ("Juveniles who adjust status as a result of an SIJ classification enjoy *all benefits* of lawful permanent residence." (emphasis added)).

To emphasize what it perceives as the gulf between a lawful permanent resident and a SIJ designee, the Government makes much of the fact that adjustment of status is a discretionary determination, to which aliens are not entitled merely by virtue of having obtained SIJ status or having filed an adjustment application. In a similar vein, the Government stresses that an alien who obtained SIJ classification may still

---

[19] Although adjustment of status may be denied at the discretion of the Attorney General, *see* 8 U.S.C. § 1255(a), the Government has given no indication that would occur here.

40

be inadmissible. But for purposes of determining whether an alien may lay claim to any constitutional protections regarding their application for admission, these points are neither here nor there. Nothing in our precedent suggests that the lack of lawful permanent resident status, potential inadmissibility, or the happenstance that visas are not currently available is dispositive in assessing an alien's entitlement to habeas review. On the contrary, an undocumented alien who has continuously lived in the country for "several years" is obviously not a lawful resident and is potentially inadmissible, yet in *Castro* we pointed out such an alien "could very well" succeed in a constitutional attack on § 1252(e)(2). 835 F.3d at 433 n.13.

Here, Petitioners have exercised the rights accorded them as SIJ designees and have had their LPR applications pending for close to two years.[20] Assuming, as the Government asserted at the time of briefing, that the waiting list was then about two years long, Petitioners' receipt of visas is imminent. We consider these circumstances, including Petitioners' proximity to LPR status with its even fuller range of rights, as further evidence of their meaningful and substantial connection with the United States.

---

[20] Although not the basis for our decision today, we note that Petitioners have lived in the United States during this period and at least some of that time has been outside of detention in local communities. *See supra* note 5. In *Castro* we explained that "physical presence is a factor courts should consider" in assessing an alien's constitutional rights, even though in the case of an alien apprehended immediately upon entering the country it may not be sufficient in establishing such rights. 835 F.3d at 448 n.30.

### 4. The Plenary Power Doctrine

In *Castro*, where the petitioners were "on the threshold of initial entry" and had no connection to the United States, we held that deference to "Congress' and the Executive's plenary power over decisions regarding the admission or exclusion of aliens" compelled a judgment for the Government. *Castro*, 835 F.3d at 450. As we observed, "the power to expel or exclude aliens [i]s a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control," *id.* at 439 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). But we also recognized that, while the political branches' plenary power over immigration is "by no means . . . subject to judicial review in all contexts," it is "certain[ly]" subject to judicial review in some contexts because that power "is [not] limitless in all respects." *Id.* at 449 n.32. Rather, the plenary power "is subject to important constitutional limitations," *Zadvydas*, 533 U.S. at 695, and it is the province of the courts to decide "whether Congress has chosen a constitutionally permissible means of implementing that power," *INS v. Chadha*, 462 U.S. 919, 941 (1983).

With those limitations in mind, we were careful in *Castro* to distinguish "aliens seeking initial admission to the country" for whom Congress, in the exercise of its plenary power, had foreclosed any claim to constitutional protection, 835 F.3d at 449 & n.32, and aliens who had developed "substantial connections with this country" and therefore did "receive constitutional protections," including the right to invoke habeas review under the Suspension Clause, *id.* at 448 (quoting *Verdugo-Urquidez*, 494 U.S. at 271) (emphasis omitted).

In contrast to the petitioners in *Castro*, Petitioners in this case fall squarely in the second category. As SIJ designees, Petitioners have satisfied the SIJ eligibility criteria, have been declared dependents of the State, have been accorded an array of significant statutory rights and procedural protections by Congress, have been "deemed paroled into the United States" for purposes of adjustment of status, and are eligible for that adjustment of status as soon as visas become available off the wait list. *See supra* Section III.B.i.1-3. In these circumstances, the plenary power of the political departments does not preclude invocation of the Suspension Clause. *See Zadvydas*, 533 U.S. at 695; *Chadha*, 462 U.S. at 941; *Castro*, 835 F.3d at 448. Indeed, if anything, it cuts the other way: the rights and safeguards that Congress has legislated for SIJ designees could be duly considered in standard removal proceedings, but they would be eviscerated by the expedited removal now sought by the Attorney General. *See supra* Section III.B.i.2. Insulating expedited orders from judicial review thus hardly accords respect to Congress's wide-ranging authority in the immigration realm.[21]

---

[21] Nor, to the extent our respect for the political branches' power over immigration policy extends to the Executive, does the Attorney General's decision here to proceed with expedited removal give rise to a concern under the plenary power doctrine. Tellingly, before this point, the Executive itself had consistently acknowledged the special relationship of SIJ designees to the United States, by instructing IJs that they "must terminate [removal] proceedings before USCIS can adjudicate the adjustment application" of SIJ applicants, 6 USCIS Policy Manual, pt. J, ch. 4 n.2 (Mar. 21, 2018), and that removal cases of children applying for SIJ status "must be administratively closed or reset for that process

Instead, we recognize that the power to expel, exclude, or deny lawful immigration status to aliens necessarily encompasses the power to *decline* to do any of these. Thus, while it remains true that "[o]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens," *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) (quoting *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895) (Harlan, J.)), that plenary power has been marshalled here to protect Petitioners, not to deprive them of process, and Petitioners therefore do not seek "to force judicial review beyond what Congress has already granted them," *Castro*, 835 F.3d at 446, but rather to enforce the very rights and review that Congress did grant.

---

to occur in the appropriate state or juvenile court," O'Leary Memorandum 2. *Cf. supra* note 17. Of course, where Congress has committed immigration decisions to the discretion of the Attorney General, "[j]udicial deference" to an exercise of that discretion "is of special importance." *Negusie v. Holder*, 555 U.S. 511, 517 (2009). But where, as here, Petitioners claim the Attorney General is now contravening Congress's mandate, they challenge "the extent of the Attorney General's authority under the [INA]" and "the extent of that authority is not a matter of discretion." *Zadvydas*, 533 U.S. at 688. Instead, the Attorney General must respect that the "formulation of [immigration] policies is entrusted exclusively to Congress," and "[i]n the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process." *Kleindienst v. Mandel*, 408 U.S. 753, 767 (1972).

44

For these reasons, Petitioners may not be denied the privilege of habeas corpus, and we proceed to the next step of our inquiry.

### ii. *Boumediene* **Step Two**

At the second step of the *Boumediene* analysis, we determine "whether the statute stripping jurisdiction . . . has provided adequate substitute procedures for habeas corpus," for if it does there is no violation of the Suspension Clause. *Boumediene*, 553 U.S. at 771. As we will explain, however, here the statute does not provide "an 'adequate and effective' alternative to habeas review." *Khouzam*, 549 F.3d at 246 (quoting *Swain v. Pressley*, 430 U.S. 372, 381 (1977)).

In *Boumediene*, the Supreme Court took care to explain that habeas review is "most pressing" in the case of executive detention, as opposed to where "relief is sought from a sentence that resulted from the judgment of a court of record." *Boumediene*, 553 U.S. at 782-83. For the writ to be effective in such a case, "[t]he habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain." *Id.* at 783; *see also INS v. St. Cyr*, 533 U.S. 289, 301 (2001) ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest."). More specifically, the Court declared it "uncontroversial . . . that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene*, 553 U.S. at 779 (quoting *St. Cyr*, 533 U.S. at 302).

45

But the INA's jurisdiction-stripping provisions do not provide even this "uncontroversial" baseline of review. Instead, § 1252(e)(2) permits habeas review of expedited removal orders as to only three exceptionally narrow issues: whether the petitioner (1) is an alien, (2) was "ordered removed" (which we have interpreted to mean only "whether an immigration officer issued that piece of paper [the removal order] and whether the Petitioner is the same person referred to in that order," *Castro*, 835 F.3d at 431 (internal citation omitted)), and (3) can prove his or her lawful status in the country. 8 U.S.C. § 1252(e)(2). It also explicitly precludes review of "whether the alien is actually inadmissible or entitled to any relief from removal," *id.* § 1252(e)(5), and of "any other cause or claim arising from or relating to the implementation or operation of" the removal order, *id.* § 1252(a)(2)(A)(i). Together, these provisions prevent us from considering "whether the expedited removal statute was *lawfully applied* to petitioners," *Castro*, 835 F.3d at 432 (quoting *Am.-Arab*, 272 F. Supp. 2d at 663), and thus preclude review of "the erroneous application or interpretation of relevant law," *Boumediene*, 553 U.S. at 779 (quoting *St. Cyr*, 533 U.S. at 302). That, however, is the "uncontroversial" minimum demanded by the Great Writ.[22] *Id.*

---

[22] Given the starkness of the jurisdiction-stripping statute's deficiency, we need not engage in an extended inquiry here. We note, however, that even if it were a closer question, other guidance in *Boumediene* would lead us to the same result. As discussed by the Second Circuit in *Luna v. Holder*, 637 F.3d 85, 98-99 (2d Cir. 2011), where it considered whether statutory motions to reopen—a process that allows Circuit Courts to engage in de novo review of "questions of law and constitutional claims"—constituted an acceptable substitute

46

Because we conclude both that Petitioners may invoke the privilege of habeas corpus and that the INA does not provide "adequate substitute procedures" in its absence, *Boumediene*, 553 U.S. at 771, we hold that § 1252(e) violates the Suspension Clause as applied to Petitioners and that the District Court therefore retains jurisdiction to consider Petitioners' claims on remand.

## C.    Temporary Injunctive Relief

As a final matter, we consider the implications of our holding for the District Court's dissolution of the temporary restraining order and denial of injunctive relief pending resolution of Petitioners' complaint.    The District Court concluded it lacked jurisdiction to issue a writ of habeas corpus and enjoin Petitioners' removal or to order them placed in standard removal proceedings, reasoning that Petitioners could not satisfy the standard for injunctive relief absent subject-matter jurisdiction.

---

for habeas review, *Boumediene* counsels us to ask whether "the purpose and effect of the [substitute] was to expedite consideration of the [detainee's] claims, not to delay or frustrate it," whether "the scope of the substitute procedure . . . [is] 'subject to manipulation' by the Government," whether the "mechanism for review . . . 'is wholly a discretionary one,'" and whether "the entity substituting for a habeas court . . . '[has] adequate authority . . . to formulate and issue appropriate orders for relief.'"  *Luna*, 637 F.3d at 97 (quoting *Boumediene*, 553 U.S. at 775-91).  For the reasons we have explained, here, as in *Luna*, those considerations also favor Petitioners.

To obtain a preliminary injunction, the moving party must show: (1) a likelihood of "succe[ss] on the merits," (2) a likelihood that the moving party will "suffer irreparable harm," (3) that the "balance of equities" weighs in the moving party's favor, and (4) that injunctive relief is in "the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). If the moving party has established the first two "most critical" factors, *Nken v. Holder*, 556 U.S. 418, 434 (2009), the district court then performs a "balancing of the factors" *Reilly v. City of Harrisburg*, 858 F.3d 173, 180 n.5 (3d Cir. 2017), to determine whether the prongs, "taken together, balance in favor of granting the requested preliminary relief," *id.* at 179. Where the Government is the non-moving party in the immigration context, the third and fourth factors generally "merge" into one. *Nken*, 556 U.S. at 435.

Considering these factors here, we conclude the District Court erred in dissolving the TRO and denying Petitioners' motion for injunctive relief.[23] The first factor, likelihood of success on the merits of their underlying habeas petition, is easily established given the incompatibility of expedited orders

---

[23] We exercise our discretion in this circumstance to address the District Court's rulings on the merits, rather than remand for the District Court to reconsider injunctive relief in light of this opinion. Although we recognize that the Court diligently sought to comport its rulings with *Castro* and did not have the benefit of our holding today, there is no need to remand where, as here, "the outcome is clear as a matter of law," *Blackledge v. Blackledge*, 866 F.3d 169, 182 (3d Cir. 2017) (citations omitted), and the interest of judicial economy counsels against doing so, *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 149 (3d Cir. 2014).

of removal with the statutory and constitutional rights of SIJ designees. Congress granted SIJ designees a clear set of rights, including eligibility to apply for adjustment to LPR status, protection against having their SIJ status revoked without statutorily prescribed process, and the due process rights that automatically attach to statutory rights. *See supra* Section III.B.i.1-2. Yet each of these rights and protections would be summarily stripped from Petitioners upon execution of the expedited orders of removal against them.

The second factor, irreparable harm, is also satisfied given the finding in this case by a juvenile court "that reunification with one or more of the child's parents was not viable due to abuse, neglect, or abandonment, and that it would not be in the child's best interest to be returned to his or her country of origin." App. 7-8. This conclusion is also bolstered by the drastic legal consequences that expedited removal would carry for Petitioners' pending applications for adjustment of status and future admissibility. *See supra* Section III.B.i.2.

The third and fourth factors also weigh in favor of Petitioners. We are aware of the "public interest in prompt execution of removal orders" and the Supreme Court's admonition against characterizing the Government harm in removal cases as "nothing more than one alien being permitted to remain while an appeal is decided." *Nken*, 556 U.S. at 435-36 (citation omitted). But the fact that the Government has not—until now—sought to remove SIJ applicants, much less designees, undermines any urgency surrounding Petitioners' removal. Instead, by approving Petitioners' SIJ applications, the Secretary of Homeland Security "acknowledge[d] . . . that the SIJ benefit was . . . sought . . . for the purpose of obtaining

49

relief from abuse or neglect or abandonment" in the countries to which Petitioners would be removed. USCIS Memorandum 3. And it is squarely in the public interest to enable individuals to partake of statutory and constitutional rights and meaningful judicial review where, as here, it is consistent with the process prescribed by Congress. *See California ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985), *amended* 775 F.2d 998 (9th Cir. 1985) (affirming injunction and allowing party to proceed without posting bond where doing so "would effectively deny access to judicial review").

## IV. Conclusion

For the foregoing reasons, we will reverse the District Court's denial of Petitioners' request for injunctive relief and remand for proceedings consistent with this opinion.[24]

---

[24] While the relief we grant today is limited to minor Petitioners, we note that in releasing one of the Petitioners and his mother and observing that the record was "completely devoid of any reason, rational or otherwise," justifying their continued detention for almost two years, Petitioners' 28(j) Letter 11, 25, 38, 47 (Sept. 14, 2017) (IJs Bond Memoranda), the IJ pointed to his power to parole the mother under 8 C.F.R. § 1236.3(b)(2) to ensure the child's "psychological well-being," *id.* at 2, as well as to 8 C.F.R. § 212.5(b)(3)(ii), which provides that if a detained child cannot be released into the custody of a non-detained relative, the child "may be released with an accompanying relative who is in detention."